# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ELIZABETH MORRISON, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 12808-VCG |
| RAY BERRY, RICHARD A. ANICETTI, MICHAEL D. CASEY, JEFFREY NAYLOR, RICHARD NOLL, BOB SASSER, ROBERT K. SHEARER, MICHAEL TUCCI, STEVEN TANGER, JANE THOMPSON, BRETT BERRY, SCOTT DUGGAN, CRAVATH, SWAINE & MOORE LLP, JPMORGAN CHASE & CO., J.P. MORGAN SECURITIES, LLC, POMEGRANATE HOLDINGS, INC., APOLLO INVESTMENT FUND VIII, L.P., APOLLO OVERSEAS PARTNERS (DELAWARE 892) VIII, L.P., APOLLO OVERSEAS PARTNERS (DELAWARE) VIII, L.P., APOLLO OVERSEAS PARTNERS VIII, L.P., APOLLO ADVISORS VIII, L.P., APOLLO MANAGEMENT VIII, L.P., AIF VIII MANAGEMENT, LLC, APOLLO MANAGEMENT, L.P., APOLLO MANAGEMENT GP, LLC, APOLLO MANAGEMENT HOLDINGS, L.P., APOLLO MANAGEMENT HOLDINGS GP, LLC, APO CORP, AP PROFESSIONAL HOLDINGS, L.P., and APOLLO GLOBAL MANAGEMENT, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

# MEMORANDUM OPINION

Date Submitted:  September 23, 2019
Date Decided:  December 31, 2019

Joel Friedlander, Jeffrey M. Gorris, and Christopher P. Quinn, of FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; OF COUNSEL: Randall J. Baron and Christopher H. Lyons, of ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California, *Attorneys for Plaintiff.*

Rudolf Koch, Matthew D. Perri, and John M. O'Toole, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Adam L. Sisitsky, Lavinia M. Weizel, Robert I. Bodian, and Scott A. Rader of MINTZ, LEVIN, COHN FERRIS, GLOVSKY AND POPEO, P.C. New York, New York and Boston, Massachusetts, *Attorneys for Independent Director Defendants.*

William B. Chandler III, Bradley D. Sorrels, Lindsay K. Faccenda, and Daniyal M. Iqbal, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware, *Attorneys for Scott Duggan, Defendant.*

Patricia L. Enerio, Jamie L. Brown, and Gillian L. Andrews, of HEYMAN ENERIO GATTUSO & HIRZELL LLP, Wilmington, Delaware, *Attorneys for Richard A. Anicetti, Defendant.*

Kevin G. Abrams, J. Peter Shindel, Jr., and Matthew L. Miller, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: Matthew A. Schwartz and Joshua S. Levy of SULLIVAN & CROMWELL LLP, New York, New York, *Attorneys for JPMorgan Chase & Co. and J.P. Morgan Securities, LLC, Defendants.*

William M. Lafferty, S. Mark Hurd, Thomas W. Briggs, Jr., Richard Li, and Elizabeth A. Mullin, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Stuart W. Gold, Richard W. Clary, of CRAVATH, SWAINE & MOORE LLP*, New York, New York, Attorneys for Cravath, Swaine & Moore, LLP, Defendant.*

Kevin R. Shannon, Matthew F. Davis, and Nicholas S. Prust, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Jonathan Rosenberg and Abby F. Rudzin of O'MELVENY & MYERS LLP, New York, New York, *Attorneys for Apollo Defendants.*

John L. Reed and Peter H. Kyle, of DLA PIPER LLP, Wilmington, Delaware; OF COUNSEL: David Clarke, Jr., of DLA PIPER LLP, Washington, D.C., *Attorneys for Berry Defendants.*

GLASSCOCK, Vice Chancellor

This matter involves the Plaintiff's claims for damages following the purchase of a grocery-store chain, The Fresh Market, Inc. ("Fresh Market" or the "Company") by Apollo investment entities. The Plaintiff is a former stockholder of the Company, purportedly acting on behalf of the stockholder class. She alleges that certain Fresh Market fiduciaries breached their duties in negotiating the sale and in obtaining the assent of the stockholders. The matter was previously the subject of a motion to dismiss, which I granted based on the fact of the approval of the merger by a majority of disinterested stockholders; that decision was reversed on appeal. The matter is now before me on the balance of the motions to dismiss, alleging failure to state a claim under Chancery Court Rule 12(b)(6). For the following reasons, I determine that the motions of several Defendants must be denied. The complaint, however, fails to state a claim against the Director Defendants, and their motion is granted.

## I. BACKGROUND

I draw the following facts from the Plaintiff's Verified Second Amended Complaint (the "SAC") and to a limited extent from documents incorporated therein.[1] This Opinion decides the motions to dismiss for those Defendants with

---

[1] Verified Sec. Am. Compl., Docket Item ("D.I.") 169 ("SAC"). The Plaintiff received documents previously through her Section 220 action, some of which she relies on in the SAC. To that extent, I take these documents into consideration with regard to the motions to dismiss. *See Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) (permitting review of documents incorporated into the complaint in a Rule 23.1 action), *aff'd*, 57 A.3d 414 (Del. 2015); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016)) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from

fiduciary duties, and reserves decision on those Defendants facing aiding and abetting claims; therefore, in this Opinion, I focus on the facts necessary to decide the motions to dismiss filed by those Defendants with fiduciary duties. The well-pled allegations of the SAC, as discussed further below, are assumed true for purposes of this Opinion.

A. *The Parties and Relevant Non-Parties*

Non-party Fresh Market is a Delaware corporation headquartered in North Carolina that operates as a specialty grocery retailer.[2]

Plaintiff Elizabeth Morrison was, at all relevant times, a stockholder of Fresh Market.[3]

Defendant Ray Berry was Fresh Market's Chairman of the Board and former CEO.[4] Defendant Brett Berry, Ray Berry's son, was a former CEO and Vice Chairman of the Board.[5] Prior to the transaction, Ray and Brett Berry together owned approximately 9.8% of Fresh Market's shares, and approximately 22% of Fresh Market equity after the deal closed.[6] Ray Berry's son-in-law, Michael Barry,

---

considering those documents' actual terms." (quoting *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013))).

[2] SAC, ¶ 25.

[3] *Id.* ¶ 24.

[4] *Id.* ¶ 26.

[5] *Id.* ¶ 27. Brett Berry was not a director, officer, or employee of Fresh Market during any period relevant to this litigation. *See Id.*

[6] *Id.* ¶ 2.

owned approximately 6% of Fresh Market stock prior to the transaction.[7] For clarity's sake, because this Opinion decides the Berrys' Motion to Dismiss only as it concerns Ray Berry, when I refer to "Berry," I am referring to Ray Berry.

Defendants Michael Casey, Jeffrey Naylor, Richard Noll, Bob Sasser, Robert Shearer, Steven Tanger, Jane Thompson, and Michael Tucci (collectively, with Richard Anicetti, the "Director Defendants") were members of the Fresh Market board of directors (the "Board").[8]

Defendant Scott Duggan was Fresh Market's Chief Legal Officer and Senior Vice president – General Counsel.[9]

Defendant Richard Anicetti, in addition to being a director on the Board, was Fresh Market's President and CEO.[10]

Defendant Cravath, Swaine & Moore LLP ("Cravath") is a New York limited liability partnership that served as Fresh Market's legal counsel for the transaction.[11]

Defendant JPMorgan Chase & Co., is a Delaware corporation and parent to Defendant J.P. Morgan Securities, LLC ("J.P. Morgan"), a Delaware limited liability

---

[7] *Id.*

[8] *Id.* ¶ 28.

[9] *Id.* ¶ 29.

[10] *Id.* ¶ 28.

[11] *Id.* ¶ 30.

company.[12]  J.P. Morgan served as Fresh Market's financial advisor in the transaction.[13]

A constellation of fifteen entities comprise the Apollo Defendants.  For the sake of this Opinion, which does not address their Motion to Dismiss, I refer to them collectively as "Apollo."  Pomegranate Holdings, Inc. is a Delaware corporation and parent company of Pomegranate Merger Sub, Inc., the company that merged with and into Fresh Market in the transaction.[14]  Pomegranate Holdings, Inc. is controlled by private-equity funds managed by Apollo Management VIII, L.P. ("Apollo Management VIII").[15]  Four separate Apollo investment funds contributed to the acquisition and retained an equity stake in Fresh Market following the transaction: Apollo Investment Fund VIII, L.P., Apollo Overseas Partners (Delaware 892) VIII, L.P., Apollo Overseas Partners (Delaware) VIII, L.P., and Apollo Overseas Partners VIII, L.P.[16]  The first three are Delaware limited partnerships, the last a Cayman Islands limited partnership.[17]  All the investment funds are managed by Apollo Management VIII.[18]  AIF VIII Management, LLC, a Delaware limited liability

---

[12] *Id.* ¶¶ 30–31.

[13] *Id.* ¶ 31.

[14] *Id.* ¶ 33.

[15] *Id.*

[16] *Id.* ¶¶ 34–37.

[17] *Id.*

[18] *Id.* ¶ 3

company, is the general partner of Apollo Management VIII.[19]  In turn, Apollo Management, L.P., a Delaware limited partnership, is the sole member and manager of AIF VIII Management, LLC.[20]  Apollo Advisors VIII, L.P., a Delaware limited partnership, serves as general partner of each of the investment funds.[21]  Apollo Management GP, LLC, a Delaware limited liability company, is the general partner of Apollo Management, L.P.[22]  Apollo Management Holdings, L.P., a Delaware limited partnership, is the sole member and manager of Apollo Management GP, LLC.[23]  Apollo Management Holdings, GP, LLC, a Delaware limited liability company, is the general partner of Apollo Management Holdings, L.P.[24]  APO Corp., a Delaware corporation, is the intermediate holding company through which Apollo Global Management, LLC holds its interests in various other Apollo entities.[25]  AP Professional Holdings, L.P., a Cayman Islands exempted limited partnership, allows managing partners at Apollo to indirectly beneficially own a majority interest in each Apollo entity.[26]

---

[19] *Id.* ¶ 41.

[20] *Id.* ¶ 42.

[21] *Id.* ¶ 39.

[22] *Id.* ¶ 43.

[23] *Id.* ¶ 44.

[24] *Id.* ¶ 45.

[25] *Id.* ¶ 46.

[26] *Id.* ¶ 47.

Non-party Neuberger Berman ("Neuberger") was a "significant institutional stockholder" in Fresh Market.[27]

Non-Party Jeff Ackerman served as Fresh Market's Chief Financial Officer.[28]

*B. Factual Background*

    1. <u>Fresh Market Faces Stock Woes, and Berry Makes an Agreement with Apollo</u>

In early January 2015, Fresh Market traded as high as $40.83 per share.[29] This represented a 21.5% increase since the second half of 2014.[30] Then, on January 11, 2015, the Board terminated Fresh Market's President and CEO, Craig Carlock, without cause and without a permanent replacement lined up.[31] The Board did not disclose details.[32] The market reacted, and the stock price dropped 11% after a single day of trading.[33] During the eight-month search for a CEO that followed, the stock price continued to fall, reaching a low of $18.70 in late August 2015.[34] Internal perspectives at the Company, however, evinced more optimism than did the market:

---

[27] *Id.* ¶ 11.

[28] *Id.* ¶ 91.

[29] *Id.* ¶ 50.

[30] *Id.*

[31] *Id.* ¶ 51 ("the Board terminated then-CEO and President, Craig Carlock. The termination was without cause and no details were disclosed about the reason for his termination.").

[32] *Id.*

[33] *Id.*

[34] *Id.* ¶ 53.

Berry wrote that the Company had "a huge untapped future" and that the stock volatility would end "once the market returns to rational evaluations of [The Fresh Market]."[35] Discounted Cash Flow ("DCF") valuations from this period, prepared for the Board by management and J.P. Morgan in connection with a share repurchase program, suggested a value range of $45.75 to $60.75 per share when the stock was trading at just $32.59.[36]

It was in this atmosphere that Apollo's Andrew Jhawar reached out to Berry on July 3, 2015 to discuss taking the Company private.[37] In an email to colleagues, Jhawar described how he "pounced" on the opportunity to discuss a going-private transaction with Berry, "given valuation and the apparent lack of love from Wall Street and the analyst community."[38] Apollo had recently taken another specialty grocery retailer private, and according to Jhawar the flexibility and decision-making offered by private ownership attracted Berry.[39] Berry and Jhawar exchanged several messages setting a time to discuss the potential transaction.[40] In contravention of Fresh Market's communication protocol, Berry did not disclose Apollo's inquiries

---

[35] *Id.* ¶ 52.

[36] *Id.* ¶ 54.

[37] *Id.* ¶¶ 55–56.

[38] *Id.* ¶ 56.

[39] *Id.* ¶ 57. Led by Jhawar, Apollo had recently taken Sprouts Farmers Markets private in a transaction with several features that made it similar to the transaction Apollo would propose for Fresh Market. *Id.*

[40] *Id.* ¶¶ 58–60.

to either the interim-CEO or the lead director.[41]  He claims to have relayed the conversations to Duggan, though there is no documentation to show whether such communication occurred.[42]

As the stock price reached its low point in August 2015, institutional stockholder Neuberger requested the company take urgent action to end the downward drift.[43]  With Berry's support, the Board hired a new CEO, Anicetti, on September 1, 2015.[44]  Following Anicetti's hire, Berry contacted Jhawar to put him in contact with his son, Brett Berry, so they could discuss an equity rollover of the Berrys' stock in connection with a going-private transaction.[45]  Berry wrote to Jhawar that he had talked with both Brett Berry and Mike Barry and that after contacting an attorney, "one of [them]" would contact Jhawar after they were certain of their position.[46]

Meanwhile, another private equity firm, CVC Capital, approached outside director Steve Tanger, who relayed the inquiry to lead director Noll "as per

---

[41] *Id.* ¶ 61–62.

[42] *Id.* ¶ 62.  Later in the SAC, the Plaintiff concludes that Duggan's response to Berry's disclosure of a different private equity suitor "does not suggest that Duggan was aware of Apollo's approach to Ray Berry and Ray Berry's active consideration of it."  *Id.* ¶ 74.

[43] *Id.* ¶ 65.

[44] *Id.* ¶ 66.

[45] *Id.* ¶¶ 68–69.

[46] *Id.* ¶ 69.

protocol."[47] Noll noted in correspondence that "the stock market [is] increasing our valuation quickly now that [Anicetti] is in place," and therefore an offer based on the current valuation was "a non-starter."[48] Noll wrote, "My guess is that they'd need to be in the range of 10-15x EBITDA to even get a real discussion going."[49] They shared this analysis with Berry.[50] On September 16, 2015, although he had not yet shared Apollo's interest, Berry disclosed to Anicetti and Duggan an inquiry from Oak Hill Capital Management about a potential going-private transaction.[51] Duggan suggested passing on the offer, given Anicetti's recent transition into the CEO role.[52] Shortly after, on September 25, Berry continued his discussions with Apollo concerning a transaction; as proposed, the transaction would increase the Berry family's ownership from approximately 9.4% pre-deal to 28.3% post-deal.[53] At that time, the Berrys orally agreed with Apollo to roll over their equity in the

---

[47] *Id.* ¶ 70.

[48] *Id.*

[49] *Id.* As the SAC notes, this EBITDA range represents a per share value of approximately $45–$70. *Id.*

[50] *Id.* ¶¶ 70–72.

[51] *Id.* ¶ 74.

[52] *Id.* Duggan suggested Berry inform Oak Hill Capital Management that "the Board just named our new CEO and he is working quickly to transition in and orient himself and let the Oak Hill guy know that you have noted his interest and end it at that." *Id.* As the Plaintiff notes, this suggests that Duggan had no knowledge of Berry's discussions with Apollo at this point. *Id.*

[53] *Id.* ¶¶ 75–76. As noted above, the Plaintiff alleges the Berrys collectively owned 9.8% pre-transaction, but Apollo's spreadsheet contemplated an increase from a 9.4% pre-transaction ownership. *Compare id.* ¶ 2 *with id.* ¶ 75. Per the SAC, the increase in equity ownership implied a profit of between $136 million and $930 million for the Berrys, collectively. *Id.*

event of a successful Apollo acquisition.[54]  Berry agreed to reach out to Duggan regarding the next steps for Apollo to present its proposal to the Company.[55]  Up to this point, Berry had still not informed the Board about his discussions with Apollo.

### 2. Berry Discloses Apollo's Interest, and the Stockholder Pressure Dials Up

On September 25, 2015, Berry told Duggan about Apollo's acquisition proposal.[56]  On September 28, when Duggan had not responded, Berry instructed Jhawar to contact Duggan directly, which Jhawar did.[57]  That same day, Duggan and Noll held a conference with Neuberger in which Neuberger advocated for a comprehensive strategic review of the Company, including a sale exploration.[58]  On October 1, Apollo submitted its proposal to acquire Fresh Market at $30 per share.[59]  The acquisition's proposed capital structure included an equity rollover with the Berrys.[60]  The proposal stated, "Apollo and the Berrys will be working together in an exclusive partnership as it relates to a transaction with The Fresh Market."[61]

---

[54] *Id.* ¶ 76.

[55] *Id.*

[56] *Id.* ¶ 77.

[57] *Id.* ¶¶ 77–78.  The SAC notes that neither the subsequent board minutes nor the 14D-9 disclose that Berry initiated contact with the Company regarding Apollo's proposal.  *Id.* ¶ 78.

[58] *Id.* ¶ 79.  On October 8, Neuberger sent Berry a letter summarizing this conference.  *Id.* ¶ 82.

[59] *Id.* ¶ 80.

[60] *Id.*

[61] *Id.*

10

The Board called a special meeting on October 15 to discuss a response to Apollo's offer.[62] Cravath was represented at the meeting by Damien Zoubek, as Fresh Market's counsel.[63] In advance of the meeting, Duggan inquired about Berry's relationship with Apollo.[64] According to the board minutes memorializing the discussion, Berry told Duggan he had only conducted three conversations with Apollo: (1) a general industry discussion; (2) a conversation about a potential transaction in which Berry expressed willingness to sell his shares for cash or roll over his equity, contingent in both cases upon the Board's support; and (3) a courtesy call prior to the October 1 proposal.[65] Berry claimed in this discussion that he had relayed each conversation to Duggan contemporaneously, and that he had relayed one of the conversations to Noll.[66] Berry also told Duggan that he had no involvement formulating Apollo's proposal, had no commitment to or agreement with Apollo, that he was not working with Apollo on an exclusive basis, and that he

---

[62] *Id.* ¶ 83.

[63] *See id.* ¶¶ 87–88.

[64] *Id.* ¶ 83.

[65] *Id.* ¶ 84.

[66] *Id.* As the Plaintiff notes, Noll's email regarding his speculation on what price would be necessary to get a discussion going suggests he was unaware of Berry's relationship with Apollo and potential interest as a buyer. *Id.* ¶ 72.

11

was unaware of any contact between Apollo and Brett Berry.[67]  Duggan presented this information to the Board, and the Board did not inquire further.[68]

At that meeting, Cravath counsel Zoubek asked Berry if he would be willing to participate in an equity rollover with an acquirer other than Apollo.[69]  According to the board minutes, while Berry maintained he had not committed to a transaction with Apollo, he told the Board that "he was not aware of any other potential private equity buyer that had experience in the food retail industry with whom he would be comfortable engaging in an equity rollover."[70]  Berry then absented himself from the meeting, and the Board determined it would develop a strategic plan, including the formation of a Strategic Transaction Committee (the "Committee") consisting of directors Naylor, Shearer, and Noll.[71]  The Board expressed concern over "continued shareholder pressure," and that the unsolicited acquisition proposals could become public.[72]  After this meeting, Berry recused himself from all future board meetings and waived his right to notice of the meetings.[73]

---

[67] *Id.* ¶ 86.

[68] *Id.* ¶ 87.

[69] *Id.* ¶ 88.

[70] *Id.*

[71] *Id.* ¶ 89.

[72] *Id.*

[73] *Id.* ¶¶ 88-89; Transmittal Aff. of Matthew D. Perri in Support of the Ind. Dirs.' Opening Br. in Support of their Mot. to Dismiss the Verified Sec. Am. Compl., D.I. 181–84 ("Perri Aff."), Ex. D, Schedule 14D-9 ("14D-9"), at 18–19.

The day of the board meeting, Apollo sent a follow-up letter regarding its "proposal (together with Ray and Brett Berry) to acquire" Fresh Market.[74] The letter stated that "Apollo (together with the Berry family rollover) is able and willing to provide 100% of the equity commitment required in this potential transaction."[75] The letter set a deadline of October 20 for a response to the offer.[76] There was a news leak the next day, and *Reuters* reported that Berry was searching for a private equity partner to make an offer for Fresh Market, while *Bloomberg* reported that Berry was working with Apollo to explore a buyout.[77]

### 3. The Board Puts the Company in Play

At an October 18 board meeting, the Board noted that the *Reuters* article contradicted Berry's representation that he had not partnered with Apollo.[78] At this point, the Board decided to publicly announce the commencement of a review of strategic and financial alternatives.[79] It also determined that any sales process would solicit multiple bids, rather than just Apollo's.[80] It directed Duggan to inquire with

---

[74] SAC, ¶ 92.

[75] *Id.*

[76] *Id.*

[77] *Id.* ¶ 94.

[78] *Id.* ¶ 95.

[79] *Id.* ¶ 98.

[80] *Id.*

Berry about the news article and his purported partnership with Apollo.[81]  On October 20, Noll wrote to Apollo, "In your letter, you state that Apollo will be working together with the Berrys on an exclusive basis with respect to a potential transaction.  We have confirmed with Ray Berry that he has no such arrangement with Apollo."[82]  On October 21, Apollo withdrew its bid but continued to engage in discussion with the Berrys regarding a potential acquisition.[83]

Over a month later, on November 25, in a letter to J.P. Morgan addressed to the Board, Apollo formally renewed its acquisition offer "together with Ray and Brett Berry" for $30 per share.[84]  That same day, Cravath spoke to Berry's Counsel, who promised to speak with Berry and "provide Cravath with a precise statement about Ray Berry's involvement with, and his views about, Apollo's offer."[85]  On November 28, prompted by Cravath's inquiries, Berry's counsel sent an email to Cravath—which Duggan shared in its entirety with the Board—detailing Berry's

---

[81] *Id.*

[82] *Id.* ¶ 100.

[83] *Id.* ¶ 101.  In its withdrawal notice, Apollo once again noted the Berrys' involvement, stating that it was withdrawing "Apollo's proposal (together with Ray and Brett Berry)." *Id.*  Other communications around this time (not shared with the Board) demonstrated Apollo's ongoing relationship with the Berrys, including sharing and soliciting comments on draft financial models. *Id.* ¶¶ 99, 101.

[84] *Id.* ¶ 102.

[85] *Id.* ¶ 103.

14

history and relationship with Apollo (the "November Email").[86] The November

Email read in pertinent part:

> Since Apollo withdrew its earlier offer in October, Mr. Berry had one conversation with Apollo. During that conversation, he agreed, as he did in October, that, in the event Apollo agreed on a transaction with [Fresh Market], he would roll his equity interest over into the surviving entity. Apollo determined the price that was offered. Mr. Berry's agreement with Apollo is oral. They have no written agreement.
>
> More generally, Mr. Berry believes it is in the best interests of the shareholders for the board to pursue a sale of the company at this time due to the low valuation of the company in spite of a built-in premium as well as the complexity of implementing the changes Rick Anicetti covered in the earnings release while under the scrutiny of the public market.
>
> Should Apollo not be successful in its bid, Mr. Berry would consider rolling his equity interest over in connection with an acquisition of [Fresh Market] by another buy-out firm that successfully bids for the company, provided he has confidence in its ability to properly oversee the company. As he mentioned to the board of directors in October, however, he believes that Apollo is uniquely qualified to generate value because of its recent success in [Fresh Market]'s space with the acquisition of Sprouts. If The Fresh Market remains public, Mr. Berry will give serious consideration to selling his stock when permitted as he does not believe [Fresh Market] is well positioned to prosper as a public company and he can do better with his investment dollars elsewhere.[87]

The Board met on December 1–2 and discussed Apollo's offer, Berry's

November Email, and concerns over investor pressure to sell.[88] The Board noted a

concern "that investors would not give the Corporation the necessary time to

---

[86] *Id.* ¶ 104; *id.* ¶ 110 ("Duggan read the November 28 Email in its entirety to the Board.").

[87] *Id.* ¶ 103–104.

[88] *Id.* ¶ 110.

implement and see the results from the strategic plan."[89] The Board noted Apollo's offer was "interesting," and it granted the Committee expanded authority to design a sales process.[90] Also at these meetings, the Committee's financial advisor, J.P. Morgan, provided DCF analysis based on management's projections that provided a range of values from $34.50 to $44.00 per share.[91]

After this meeting, Berry confirmed at Fresh Market's request, (1) a willingness to discuss an equity rollover with a successful bidder other than Apollo and (2) an agreement not to discuss an equity rollover with any party until authorized to do so by Fresh Market.[92] After confirming, Berry told Anicetti the Board should have immediately engaged in discussions with Apollo and that he was unsatisfied with the timeline of the Board's process.[93]

Apollo signed a confidentiality agreement on December 9, agreeing not to "initiate or maintain contact" with any director at Fresh Market without the Company's express permission.[94] On January 5, 2016, however, Jhawar wrote a purported New Year's greeting to Berry: "Hopefully, 2016 will be an exciting year

---

[89] *Id.* ¶ 110.

[90] *Id.*

[91] *Id.* ¶ 112.

[92] *Id.* ¶ 114.

[93] *Id.* ¶ 121. Anicetti reported Berry's comments to the Committee at a December 22 Committee meeting. *Id.*

[94] *Id.* ¶¶ 119–20. Jhawar's call lists and email records suggest he may have violated the agreement by communicating with the Berrys around this time. *See id.* ¶¶ 118, 120.

for all of us to do something together."[95]  Berry responded on January 8: "We are anticipating the possibility of an exciting 2016 with us participating together on a mutually rewarding project."[96]

### 4. The Board Conducts a Sale of the Company

#### a. The Board Institutes a Bidding Process

Over the course of the sales process, J.P. Morgan contacted thirty-two potential bidders, twenty of whom signed confidentiality agreements and received due diligence on Fresh Market, and the Committee met nineteen times.[97]  On January 12, 2016, Fresh Market set a deadline of January 25 for potential suitors to submit bids.[98]  It represented to prospective bidders that Berry was open to discussing a potential rollover when authorized to engage by the Company.[99]  At least one potential acquirer, Kroger, expressed strong interest in having discussions with Berry, given the importance of a potential equity rollover, but the Board determined that the no-contact rule would remain until it had determined to proceed with a

---

[95] *Id.* ¶ 122.

[96] *Id.*  Duggan later represented to the Board at a January 21 meeting that Berry confirmed he had not spoken to any potential participant.  *Id.* ¶ 125.  In addition to the New Year's greeting emails, an email from Jhawar's assistant reminded him to call Brett Berry, and so additional contact between Apollo and the Berry family may have transpired.  *Id.* ¶ 124.

[97] 14D-9, at 21–22.

[98] SAC, ¶ 123.

[99] *Id.*

transaction and established material terms.[100] Meanwhile, internal documents from

Apollo at this time show that it considered itself partnered exclusively with the

Berrys in the bid for Fresh Market.[101]

On January 25, several parties submitted indications of interest.[102] Apollo's

was at $31.25 per share.[103] As the sale process continued, J.P. Morgan gave a

presentation to the Committee on February 25 and noted that Apollo continued to be

motivated about the transaction, while other suitors' interest waned.[104] Ultimately,

Fresh Market accelerated the process for Apollo and permitted it to submit a bid on

March 8, ahead of the March 14 date communicated to other bidders.[105] Apollo

submitted a definitive proposal of $27.25 per share, four dollars less than its

---

[100] *Id.* ¶¶ 126–27.

[101] *Id.* ¶ 128 (Apollo was "[p]artnered exclusively with the founders"; "We are partnered together with . . . the Berry Family . . . who would roll $140 million of equity"; "we have maintained a strong relationship with the Berry family, who will roll over 4.5mm shares into the transaction").

[102] *Id.* ¶ 137.

[103] *Id.* The SAC contains allegations that Apollo's "client executive" at J.P. Morgan, Christian Oberle, fed inside information on the bid process to Apollo, even though he was not on the Fresh Market transaction team. *See id.* ¶¶ 130–36. According to the alleged facts, Oberle conveyed messages from Apollo to the team working on the Fresh Market transaction and advocated for Apollo, in the meantime providing Apollo with valuable insights in return. *See id.* ¶¶ 138–46. This inside information, according to the SAC, gave Apollo a distinct advantage, including being able to submit its bid earlier than other parties. *Id.* ¶ 146. The SAC does not allege that the Board, Duggan, Anicetti, or Berry knew about these communications.

[104] *Id.* ¶ 142. According to the minutes, "KKR's interest was waning . . . TPG's interest was also waning . . . Sprouts had decided that they would not proceed . . . Kroger was concerned about its bandwidth. . . ." *Id.*

[105] *Id.* ¶¶ 146–47.

indication of interest.[106] Its bid was not contingent upon an equity rollover with the Berrys.[107] No other suitor submitted a definitive bid.[108]

Before the Board made a decision, J.P. Morgan provided the Board with an updated conflicts disclosure that discussed its business relationship with Apollo and represented that the "senior deal team members" assigned to the Fresh Market sale were not "currently providing services" to Apollo and were not "member[s] of the coverage team" for Apollo.[109]

### b. The Committee Requests Additional Financial Projections

From December 2015 through the end of the sales process in March 2016, the Board reviewed several different financial projections. Originally, in December 2015, management provided the Board with a three-year financial model (the "Management Projections") that CFO Ackerman described as "pressure tested."[110] Ackerman noted at the December meetings that the Management Projections

---

[106] *Id.* ¶ 147.

[107] *Id.* ¶ 179.

[108] *Id.* ¶ 147.

[109] *Id.* ¶ 149. The conflict memorandum did not disclose J.P. Morgan employee Oberle's communications with both the Fresh Market team and Apollo's Jhawar. *Id.* Following the deal's close, Oberle and Jhawar exchanged congratulations by email. *Id.* ¶¶ 149–50.

[110] *Id.* ¶ 153. According to the SAC, it appears management had provided J.P. Morgan with "downward revised projections" in November, then, after it presented the Management Projections to the Board on December 1–2, it asked J.P. Morgan to "disregard the downward revised projection provided to you on November 18." *Id.*

included a "15% overall risk adjustment . . . based on likelihood of achievability."[111]

Documents incorporated by reference into the SAC suggest the Board nonetheless perceived execution risks regarding these projections.[112] However, on February 2, 2016, with the sale process well underway, the Board approved management's 2016 operating plan, which "tracked" the Management Projections.[113] In addition, the Board asked for stretch targets—higher projections—to motivate management performance.[114]

Duggan discouraged movement on the stretch targets.[115] On February 25, he organized a meeting with the Committee and legal counsel to "walk through the type of information that we should expect the Board will receive in the event an offer is

---

[111] *Id.* ¶ 185.

[112] *See* Perri Aff., Ex. L, Minutes of the Board of Directors Meeting dated December 1–2, 2015, at 18 ("[T]he Board was of the view . . . that there were significant risks on being able to successfully implement all of the initiatives and achieve the anticipated results. There was concern expressed that there was likely to be unexpected industry dynamics that could make achieving the forecasted results quite difficult, and the competitive pressure would continue or become more significant, further putting at risk the achievability of the forecasted results"); 14D-9, at 20 ("At the meeting, the Board discussed that if [Fresh Market] was not successful in executing on the new strategic plan, that could have a significant downward effect on [Fresh Market's] valuation, and that there was significant risk in successfully executing the strategic plan, especially in light of the industry and competitive pressures [Fresh Market] was facing. [Fresh Market's] management and J.P. Morgan also reviewed sensitivities to the [Management Projections] in the event that revenue or gross margin fell short of what was reflected in the [Management Projections].").

[113] SAC, ¶ 154.

[114] *Id.* ¶¶ 155–57. Anicetti notified the Board that management would attempt to "tackle the question of stretch targets" by the March board meeting, and director Jane Thompson responded, "the stretch plan is still top of mind." *Id.* ¶ 157.

[115] *Id.* ¶ 160. On February 21, Duggan emailed Anicetti that he wanted "to avoid an email deliberation running on from [director Thompson's] message." He also emailed Committee member Naylor that day that he "wanted to chat regarding Jane's emails." *Id.*

presented or offers are presented."[116]   After discussing the sale's progress, the February 25 meeting focused on the need for "additional scenario analyses . . . in light of the Corporation's recent business performance and the risks relating to the Corporation's ability to execute on its strategic plan, as well as the trends facing the specialty food retail industry as a whole."[117]  The Committee purportedly based this decision to request "additional financial projection scenarios" on "feedback that the Corporation has received throughout the [sale] process from potential bidders that there was a high degree of perceived execution risk inherent in the Corporation's strategic plan."[118]  The SAC alleges, however, that "JP Morgan gathered recurring positive bidder feedback" and that any hesitancy was based on other factors.[119]

Lead director Noll was not present at the February 25 meeting; afterward, Duggan updated him by email but did not discuss the Committee's request for additional financial scenarios.[120]  On March 1, Duggan sent Noll a list of topics for the March board meeting, again without including discussions of additional financial

---

[116] *Id.* ¶¶ 159–61.

[117] *Id.* ¶ 162.

[118] *Id.*

[119] *Id.* ¶ 164.

[120] *Id.* ¶ 163. The emails relied upon in the SAC show that Noll was in London on Company business. *See* Transmittal Aff. of Daniyal M. Iqbal in Support of Def. Scott Duggan's Reply Br. In Further Support of His Mot. to Dismiss the Verified Sec. Am. Compl., D.I. 223 ("Iqbal Aff."), Ex. C, at 1 (Noll stated in email sent the day of meeting, "I'm in London meeting with investors.").

scenarios.[121] He sent the other Committee members, Naylor and Shearer, an outline for the upcoming board meeting that included a sensitivity analysis from J.P. Morgan, and indicated that he would share "with the Committee as a whole" after they reviewed it.[122]

That same day, CFO Ackerman advised J.P. Morgan that management "do[es] not have an updated" long run strategic plan and "still plan[s] to execute against the previously submitted" Management Projections.[123] The next day, management contacted J.P. Morgan to have a "sensitivity discussion."[124] On March 3, the Committee met—again without Noll—to request that management and J.P. Morgan "refine [sensitivities on the Management Projections] . . . and develop additional financial projection scenarios so that the Board would have that perspective when it met to determine how to respond to any bids that were received."[125] On March 4, the Committee requested that management "weigh in on the merit of things," and Anicetti indicated to Ackerman that management would provide an analysis of its

---

[121] SAC, ¶ 165.

[122] *Id.* ¶ 165; Iqbal Aff., Ex. F, at 1 ("Working with outside counsel, we put together an outline of a Board meeting at which a proposal is considered and that outline is attached . . . Once you take a look, I would plan on sharing with the Committee as a whole.").

[123] *Id.* ¶ 166.

[124] *Id.* ¶ 167.

[125] *Id.* ¶ 168.

22

projections.[126] On March 6, Naylor asked Duggan when J.P. Morgan would complete the sensitivities, and Duggan said they would be done "after a proposal is put forward."[127] Ultimately, management decided to postpone and review what J.P. Morgan developed.[128]

On March 7—the day before Apollo's bid submission—J.P. Morgan created draft sensitivities for unit growth, gross margin, and revenue in response to the Committee's request.[129] The unit growth scenario was an upside case that contemplated faster growth than the Management Projections.[130] J.P. Morgan submitted these sensitivities to management on March 8, the day of Apollo's bid.[131] Later that day, in the afternoon, J.P. Morgan sent revised sensitivities that excluded the upside unit growth scenario.[132] In addition, it requested confirmation that "sensitivities to the company projections are prepared by, or at the direction of, and

---

[126] *Id.* ¶ 169 ("Anicetti further advised Ackerman that senior management was preparing to present a visual model illustrating the sales and EBITDA impact if [Management Projections were] achieved six months earlier than planned, or six, nine, or twelve months later than expected. Anicetti also prepared a draft of qualitative risks to the plan.").

[127] *Id.* ¶ 170.

[128] *Id.* ¶ 171.

[129] *Id.* ¶ 172. The SAC alleges the sensitivities were reviewed internally and adjusted downward prior to submission to Fresh Market. *Id.*

[130] *Id.* ¶ 173.

[131] *Id.*

[132] *Id.* ¶ 174.

are approved by the management of [Fresh Market]."[133]  Raj Vennam, a Fresh Market finance executive, confirmed twenty-five minutes later.[134]

On the evening of March 8, J.P. Morgan submitted an additional scenario that suggested lower values by combining the comparable growth and gross margin scenarios.[135]  J.P. Morgan revised and resubmitted the projection scenarios again that same evening.[136]  Management confirmed within an hour of receipt.[137]  The SAC charts the results of J.P. Morgan's revisions over March 7 and 8: On March 7, the three initial scenarios provided a range of share value spanning from $27.24 to $40.12 per share; by the final version on the evening of March 8, the range was $20.89 to $32.73 per share.[138]  The March 8 Committee minutes stated, "Management confirmed that it was preparing more fulsome forecast sensitivities for J.P. Morgan to use in its valuation analyses."[139]

---

[133] *Id.*

[134] *Id.*

[135] *Id.* ¶ 175–77.

[136] *Id.*

[137] *Id.* ¶ 176.

[138] *Id.* ¶ 177.

[139] *Id.* ¶ 178.

### c. The Board Negotiates and Finalizes the Merger

On March 8, 2016, the Committee determined that Apollo's bid was insufficient.[140] In response, on March 9, Apollo submitted a "best and final" offer of $28.50 per share, an increase of $1.25 per share over its previous offer.[141] At this point, the Committee decided to allow Apollo to engage in "chaperoned" discussions with the Berry family, although the price remained confidential.[142] Berry wrote to Jhawar and Brett Berry on March 9: "It is exciting that [The Fresh Market] has decided to proceed with Apollo. It will be great to hear the full story once we are cleared to talk. I am looking forward to working with you both to help [Fresh Market] develop into a viable high growth and profitable retailer."[143]

On March 10, the Committee recommended to the Board that it accept Apollo's offer for $28.50 per share.[144] At that board meeting, Anicetti and Ackerman described the Management Projections as "an optimistic scenario if every element of the plan went according to estimates," and "more of an optimistic case at this point," which justified the lower financial scenarios.[145] Preliminary results for

---

[140] *Id.* ¶ 179.

[141] *Id.* ¶ 180.

[142] *Id.*

[143] *Id.* ¶ 181.

[144] *Id.* ¶ 182.

[145] *Id.* ¶ 185. As noted above, the Management Projections included a 15% risk adjustment. *Id.*

first quarter 2016 showed that comparable store sales were in line with the Management Projections, but new store sales had slightly underperformed.[146]

Also at the March 10 meeting, J.P. Morgan presented valuation analysis on the Management Projections as well as three downside scenarios.[147] Its downward revisions were based on (1) an increase in the discount rate, (2) an increase in the equity risk premium, and (3) a decrease in the terminal year EBITDA.[148] Communications at J.P. Morgan regarding the draft scenarios reveal some internal skepticism.[149] Absent the downward revisions, J.P. Morgan's DCF analysis of Management Projections—including the increased discount rate and low implied EBITDA multiple—implied a valuation range of $33.75 to $42.25 per share.[150]

The Board met again on March 11 and approved the merger at $28.50 per share.[151] Anicetti again stated the additional financial scenarios were necessary to

---

[146] *Id.*

[147] *Id.* ¶ 186. The downside scenarios were (1) underperforming sales, (2) worse-than-anticipated margins, and (3) worse-than-anticipates sales and margins. *Id.*

[148] *Id.* ¶¶ 187–88. Specifically, J.P. Morgan increased its discount rate from an initial 8.5%-9.5% range to 9.0%-10.0%. *Id.* ¶ 187. It based this upward revision on a change in the betas of specialty retailers. *Id.* The higher impact change, however, came from the equity risk premium, which it increased 75 basis points, from a range of 6.0%-7.0% to 6.75%-7.75%. *Id.* This increase was in contrast to the supply-side equity risk premium, which decreased from 6.21% for 2015 to 6.03% for 2016. *Id.* As a result, the terminal year EBITDA multiple reduced from prior estimations of seven to nine times down to less than five. *Id.* ¶ 188.

[149] *See id.* ¶ 189. J.P. Morgan Managing Director Ben Wallace reviewed drafts of the DCF analysis and opined that the beta range for the discount rate "isn't justified" and that the terminal multiples "all seem low" based on the trading range. *Id.*

[150] *Id.* ¶ 190.

[151] *Id.* ¶ 191.

"provide dimension" on risks in the Management Projections.[152]  Following the merger's close, Berry sent Duggan an email, which read in part, "Thanks for all of your smart and caring work during this long drawn out process.  We need to sit down over a glass or two of wine and reminisce."[153]

According to the SAC, several members of Fresh Market management would receive benefits related to the sale, irrespective of continued employment.[154] Anicetti's employment contract included single-trigger vesting of his equity awards upon a change-in-control.[155]  He would receive $5,893,732 in single-trigger severance compensation, as well as an additional $3,229,312 in double-trigger severance compensation if he did not continue with Fresh Market under Apollo.[156] Ackerman would receive $1,942,967 in single-trigger severance compensation, as well as $1,706,403 in double-trigger severance.[157]  Duggan would receive $1.2 million in single-trigger equity-based compensation, with an additional $1.1 million in double-trigger compensation if terminated.[158]

---

[152] *Id.* ¶ 192.

[153] *Id.* ¶ 194.

[154] In its acquisition proposals, Apollo stated that it "look[ed] to partner with established and experienced executives," and that "[i]ncentives are aligned between Apollo and our management team partners." *Id.* ¶ 184.  The SAC notes that Apollo compensates management through performance options that vest if Apollo realizes certain multiples of invested capital.  *Id.*

[155] SAC, ¶ 67.

[156] *Id.* ¶ 183.

[157] *Id.*

[158] *Id.* ¶ 10.

27

Fresh Market announced the acquisition, including the Berrys' equity rollover, on March 14.[159]  At $28.50 per share, the aggregate purchase price was $1.36 billion.[160]  The merger agreement also provided for a twenty-one-day "go-shop" period.[161]  Apollo possessed matching rights on any offer as well as a $34 million termination fee if Fresh Market terminated its purchase in favor of a superior offer, representing approximately 2.5% of the purchase price.[162]  No alternative bidder emerged.[163]  *Bloomberg* published an article that day noting the advantages the Berrys and Apollo each provided for the other and speculating that these advantaged led to an "edge" for Apollo in the acquisition.[164]

### 5. Fresh Market Files its 14D-9

On March 25, Fresh Market publicly filed its Schedule 14D-9 (the "14D-9"), and Apollo publicly filed its Schedule TO.[165]  Duggan drafted the 14D-9 with Cravath, and the Director Defendants approved.[166]  The 14D-9 omitted the following facts:

---

[159] *Id.* ¶ 195.

[160] *Id.*

[161] *Id.* ¶ 197.

[162] *See id.* ¶¶ 195, 197 ($34 million termination fee equals 2.5% of aggregate $1.36 billion purchase price).

[163] *Id.*

[164] *Id.* ¶ 196.

[165] *Id.* ¶ 198.  The 14D-9 incorporated the schedule TO by reference.  *Id.* ¶ 199.

[166] *Id.* ¶ 199.

- Jhawar's July 3, 2015 proposal to Berry that he join Apollo in a buyout through an equity rollover;[167]

- Berry's September 25, 2015 oral agreement with Apollo to roll over his equity in the event of an Apollo acquisition;[168]

- Apollo's representations that it had partnered exclusively with the Berrys;[169]

- The fact that Berry's statements denying an agreement with Apollo were contradicted by his November Email;[170]

- Berry's first communication to the Board regarding Apollo's unique attributes and his preference for Apollo as a partner;[171]

- Berry's second communication to the Board on October 15 that "he was not aware of any other potential private equity buyer that had experience in the food retail industry with whom he would be comfortable engaging in an equity rollover;"[172]

- Neuberger's requests for a strategic review and exploration of sale and the Board's acknowledgement of existing shareholder pressure;[173]

---

[167] *Id.* ¶ 205.

[168] *Id.*

[169] *Id.*

[170] *Id.* ¶ 206.

[171] *Id.* ¶ 207.

[172] *Id.*

[173] *Id.* ¶ 208.

- Berry's communication in the November Email that he would consider selling his shares if Fresh Market remained public;[174]

- Berry and Jhawar's "New Year's" emails;[175]

- the fifteen percent risk adjustment built into the Management Projections;[176]

- J.P. Morgan's creation of additional downside scenarios *after* Fresh Market's receipt of Apollo's offer; and[177]

- The truth that J.P. Morgan, not management, provided the additional financial scenarios.[178]

In addition, the SAC alleges the Schedule TO contains material omissions because it does not disclose Apollo's initial call to Berry, Berry's oral agreement, or the "New Year's" greetings between Berry and Apollo.[179]

*C. Procedural History*

Plaintiff Elizabeth Morrison filed her original Complaint on October 6, 2016 for breach of fiduciary duty against the Director Defendants, Ray Berry, and Anicetti, and aiding and abetting against Brett Berry.[180] All defendants moved to

---

[174] *Id.*

[175] *Id.* ¶ 209.

[176] *Id.* ¶ 211.

[177] *Id.* ¶ 212.

[178] *Id.*

[179] *Id.* ¶¶ 205, 209–210.

[180] Compl., D.I. 1.

30

dismiss.[181]  I granted the motions to dismiss in a Letter Opinion on September 28, 2017, finding that the majority vote of disinterested stockholders cleansed any breaches of duty.[182]

The Plaintiff appealed that decision, and the Supreme Court reversed and remanded, finding that the Defendants failed to show the stockholder vote was fully informed, and thus the business judgment rule did not apply under *Corwin*.[183]  The Plaintiff amended her complaint on March 7, 2019, adding a claim for breach of fiduciary duty against Duggan and claims for aiding and abetting against J.P. Morgan, Apollo, and Cravath.[184]  All Defendants moved to dismiss on May 1.[185]  I granted the Plaintiff leave to amend her complaint a second time, and she did so on June 3.[186]  All Defendants moved to dismiss the SAC on July 12.[187]

I heard oral argument on all seven motions to dismiss on September 23, 2019 and considered the matter fully submitted at that time.  As noted previously, my decision here concerns only those defendants with fiduciary duties—the Director

---

[181] D.I. 12, 14, 15.

[182] *Morrison v. Berry*, 2017 WL 4317252 (Del. Ch. Sept. 28, 2017), *rev'd*, 191 A.3d 268 (Del. 2018), *as rev'd* (July 27, 2018).

[183] *Morrison v. Berry*, 191 A.3d 268, 275 (Del. 2018), *as rev'd* (July 27, 2018).

[184] Verified Am. Compl., D.I. 88.

[185] D.I. 139–49.

[186] SAC.

[187] D.I. 187–96.

Defendants, Berry, Duggan, and Anicetti. I reserve decision on the aiding and abetting claims against Apollo, J.P. Morgan, Cravath, and Brett Berry, which may be to some extent determined by my decision here.

## II. ANALYSIS

All Defendants have moved to dismiss this action under Chancery Court Rule 12(b)(6).[188] In considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[189]

However, I do not need to accept "conclusory allegations unsupported by specific fact" as true, nor must I "draw unreasonable inferences" in the Plaintiff's favor.[190] Additionally, if allegations or documents "incorporated into the complaint effectively negate the claim as a matter of law," then I may dismiss the claim.[191]

---

[188] Defendant Brett Berry has also moved to dismiss for lack of personal jurisdiction under Chancery Court Rule 12(b)(2).

[189] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).

[190] *Thermopylae Capital Partners, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *9 (Del. Ch. Jan. 29, 2016) (quoting *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011)).

[191] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

*A. The Plaintiff Fails to State a Non-Exculpated Claim for Breach of Fiduciary Duty against the Director Defendants*

The Director Defendants benefit from an exculpatory provision under 8 *Del C.* § 102(b)(7) that protects them from liability for violations of their duty of care.[192] Therefore, to survive the Motion to Dismiss in this post-closing damages action, the Plaintiff must plead a non-exculpated claim, which requires sufficiently alleging the Director Defendants were either self-interested, lacked independence, or acted in bad faith.[193] Although *Revlon* applies to the underlying company sale process—and is thus a context-specific lens through which to look at the defendants' duties—this does not change the requirement that the Plaintiff plead a non-exculpated claim.[194]

---

[192] Perri Aff., Ex. A, Certificate of Incorporation of Fresh Market, Inc., at 5.

[193] *In re Cornerstone Therapeutics Inc, Stockholder Litig.*, 115 A.3d 1173, 1175–76 (Del. 2015) ("A plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct—be it Revlon, Unocal, the entire fairness standard, or the business judgment rule . . . even if a plaintiff has pled facts that, if true, would require the transaction to be subject to the entire fairness standard of review, and the interested parties to face a claim for breach of their duty of loyalty, the independent directors do not automatically have to remain defendants."); *In re Essendant, Inc. S'holder Litig.*, C.A. No. 2018-1789-JRS, Mem. Op., at 19 (Del. Ch. Dec. 30, 2019) ("given [defendant's] exculpatory charter provision, in order to survive the . . . Board's Motion to Dismiss, the Complaint must state valid, non-exculpated claims."); *Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016) ("[W]hen asserting a . . . claim for damages against directors post-close, a plaintiff must allege facts making it reasonably conceivable that there has been a non-exculpated breach of fiduciary duty by the board. . ." (citing *Chen v. Howard*, 87 A.3d 648, 691 (Del. Ch. 2014))).

[194] *Kahn v. Stern*, 183 A.3d 715, at *1 n.3 (Del. 2018) (TABLE) ("The presence of an exculpatory charter provision does not mean that *Revlon* duties no longer apply. Rather, *Revlon* remains applicable as a context-specific articulation of the directors' duties but directors may only be held liable for a non-exculpated breach of their *Revlon* duties.").

33

To state a claim, then, the Plaintiff must plead a breach of loyalty; that the Director Defendants were interested in the transaction, lacked independence, or acted in bad faith. The Plaintiff can show the Director Defendants lacked independence in several ways: "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[195] Or, "[a] director lacks independence if . . . her judgment is controlled by another director or driven by extraneous considerations."[196] Alternatively, to state a claim for bad faith conduct, the Plaintiff must allege the Director Defendants "knowingly and completely failed to undertake their responsibilities."[197] The Plaintiff can do this by showing that

> the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, the fiduciary acts with the intent to violate applicable positive law, or the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a *conscious* disregard for his duties.[198]

The common factor in these descriptions of bad faith is that "the directors acted with scienter, meaning they had actual or constructive knowledge that their conduct was

---

[195] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *7 (Del. Ch. Jan. 3, 2013) (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[196] *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984)).

[197] *Lyondell Chem*, 970 A.2d at 243–44.

[198] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) (emphasis added).

legally improper."[199]  Thus, "[e]ven gross negligence, without more, does not constitute bad faith."[200]

Because I find the facts, as alleged, do not state a claim that the Director Defendants were interested, lacked independence, or acted in bad faith, I grant their Motion to Dismiss.

### 1. The Plaintiff does not Adequately Plead the Director Defendants were Self-Interested or Lacked Independence

The Plaintiff fails to plead that the Director Defendants lacked independence. Instead, she makes a novel argument to support the familiar claim that these defendants were self-interested in the transaction, and held pecuniary interests not shared with the stockholders. The Plaintiff alleges activist shareholder pressure improperly motivated the Director Defendants to act with self-interest, in consideration of those directors' reputations. The Plaintiff argues, "[t]he best way to understand the rationale for the sale process is that its true purpose was to alleviate pressure on the incumbent directors."[201]  Essentially, the Plaintiff argues that faced with activist pressure and the specter of a proxy contest, the Director Defendants

---

[199] *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017) (internal quotation marks and citation omitted).

[200] *In re Paramount Gold & Silver Corp. S'holders Litig.*, 2017 WL 1372659, at *14 (Del. Ch. Apr. 13, 2017) (quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *23 (Del. Ch. Oct. 24, 2014)).

[201] Pl.'s Ans. Br. In Opp'n. to the Sell-Side Defs.' Mots. to Dismiss, D.I. 218 ("Pl. Sell-Side Br."), at 48.

decided to eliminate their personal and professional problems by pretending to auction the Company but in reality handing it to Apollo in a short-term, unfairly cheap sale.

In support, the Plaintiff offers several allegations. First, the Board was facing increasing activist pressure. At the conference on September 28, Neuberger was already urging the Board to conduct a comprehensive strategic review, which included a sale assessment.[202] At its October 15 meeting, the Board noted Fresh Market "could be the subject of continued shareholder pressure, continued shareholder communications and, potentially, more unsolicited acquisition proposals. . ."[203] To compound the issue, on November 28, 2015, Berry's counsel told Cravath that Berry "believes it is in the best interests of the shareholders for the board to pursue a sale of the company," and that in the absence of a sale, Berry would consider divesting his substantial minority interest in the Company on the open market.[204] Thus, the Plaintiff concludes, unless they sold the Company, activist pressure combined with Berry's open-market sale could drive the stock price down, inciting a proxy contest and compounding the damage already done to the directors' reputations by their firing and testudinal effort to replace the previous CEO.

---

[202] *See* SAC, ¶¶ 79, 82.

[203] *Id.* ¶ 89.

[204] *Id.* ¶ 104.

36

Accepting the alleged facts as true, I can conclude the Director Defendants faced mounting activist pressure and were concerned about their reputations, as any director would be under such pressure. I cannot reasonably infer, however, that this activist pressure implies they acted for improper motives. I note that because of Fresh Market's staggered board, only directors Naylor, Thompson, and Berry would stand for election at the next annual meeting in the spring of 2016.[205] As this Court has previously found:

> [T]here is no logical force to the suggestion that otherwise independent, disinterested directors of a corporation would act disloyally or in bad faith and agree to a sale of their company 'on the cheap' merely because they perceived some dissatisfaction with their performance among the stockholders or because of the possibility that a third of their number might face opposition for reelection at the next annual stockholders meeting.[206]

The Plaintiff contends that "[i]nitiating a sham sale process with an expected winning bidder—Apollo and the Berrys—would placate Ray Berry and eliminate the directors' reputational risk, so long as any resulting stockholder complaint did not survive judicial scrutiny under the new pleading requirement of *Corwin v. KKR*

---

[205] Perri Aff. Ex. C, Schedule 14A, Notice of Annual Meeting and Proxy Statement ("Proxy"), at 7.

[206] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 729 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000). The staggered Board in this case means a third of directors (including Berry) would be up for reelection at the 2016 annual meeting. *See* Proxy, at 7. I note that, unlike here, in *Lukens*, the Court went on to note the directors decided to sell *before* receiving the stockholder proposals that exerted the activist pressure, and the Court determined this sequence of events confirmed the lack of "logical force" behind the plaintiff's allegation. *Id.* In other words, the Court in *Lukens* found the argument both legally *and* factually unsupportable. *Id.*

*Fin. Hldgs. LLC.*"[207]  But this asks me to infer that the Director Defendants, for the purpose of protecting their reputations as fiduciaries, breached their fiduciary duties, risking the far greater blackening of their fiduciary reputations, in the hope that the *Corwin* pleading standard would hide their misdeeds, *at the same time* (per the SAC) sowing material omissions in the disclosures, thereby eliminating *Corwin*'s protections.  I cannot draw this unreasonable inference.

Nor does the Plaintiff allege facts indicating that a proxy fight was on its way. No stockholder—Berry, Neuberger, or anyone else—initiated a proxy fight or threatened one.  The effects of an open-market sale by Berry, whether a stock collapse or a resultant proxy contest, remain speculative.  Finally, if the Director Defendants had an interest in consummation of a sale, there is no reason they needed to run a sham auction process, as the Plaintiff alleges they did.  The idea that the Director Defendants, a majority of whom were insulated from removal in the short term, would nonetheless breach their fiduciary duties and harm their own pecuniary interests as stockholders by orchestrating a sham auction for the purpose of avoiding speculative reputational risk is not credible.

---

[207] Pl. Sell-Side Br., at 49–50.

## 2. The Plaintiff Does Not Plead Facts from which I may infer that the Director Defendants Acted in Bad Faith

The Plaintiff can also plead a claim for a breach of the duty of loyalty if she alleges facts giving rise to a reasonable inference of bad faith.[208] A demonstration of bad faith requires acts or omissions taken against the interest of the Company, with scienter. The Plaintiff alleges misconduct relating to each part of the transaction, and so I examine the allegations essentially in chronological order.

### a. Initiation of the Sales Process

The Plaintiff focuses first on the Director Defendants' decision in December 2015 to initiate a sale of the Company. The alleged facts show that by the time the Board initiated the sale, it had an accurate picture of the landscape. The Board knew that Berry and Apollo had an agreement for an equity rollover should Apollo succeed in its bid.[209] It knew that Berry's strong preference for Apollo made an equity rollover with another buyer unlikely.[210] The Board also knew that Berry had made misrepresentations by initially downplaying his involvement with Apollo.[211] In sum,

---

[208] *See Kahn v. Stern*, 183 A.3d 715, at *1 (Del. 2018) (TABLE) (requiring plaintiff to "plead[] facts that support a rational inference of bad faith" rather than requiring plaintiff to "plead facts that rule out any possibility other than bad faith" (citing *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 258–60 (Del. 2017), *rev'd* (Mar. 28, 2017))).

[209] SAC, ¶ 104.

[210] *Id.* ¶ 88 (Berry was "not aware of any other potential private equity buyer . . . with whom he would be comfortable engaging in an equity rollover"); *id.* ¶ 104 ("[Berry] believes that Apollo is uniquely qualified to generate value because of its recent success in [Fresh Market's] space. . .").

[211] *Compare id.* ¶ 86 (Berry represented he "had no arrangement or agreement with Apollo") *with id.* ¶ 104 ("[Berry] agreed, as he did in October, that, in the event Apollo agreed on a transaction

the Director Defendants were fully aware of Apollo's advantage in any prospective sale process. The alleged facts, however, do not support an inference that the sale's outcome was a foregone conclusion, or—more importantly—was intentionally structured to forgo value available to the stockholders. Even if Berry's strongly-worded preference for Apollo made another equity rollover deal unlikely, he confirmed to the Board three separate times—including after his disclosure of an agreement with Apollo in the November Email—that he did not have an exclusive agreement with Apollo and that he would consider another partner under the right conditions.[212] Drawing all reasonable inferences for the non-moving party, as I must at this stage, I can infer that the Director Defendants knew the possibility of Berry's agreeing to a non-Apollo partnership was slim, if not impossible.

Armed with this information, the Director Defendants faced a difficult situation. Major stockholders Neuberger and Berry were both urging a sale of the Company or, at the very least, a sale exploration.[213] Berry's involvement with Apollo had leaked to *Reuters* and *Bloomberg*, making the Company's situation

---

with [Fresh Market], he would roll his equity interest over into the surviving entity . . . Mr. Berry's agreement with Apollo is oral.").

[212] Berry represented to the Board ahead of the October 15 meeting that he "was not working with Apollo on an exclusive basis." *Id.* ¶ 86. Noll later wrote to Apollo that Berry confirmed the lack of exclusivity. *Id.* ¶ 100. Before the initiation of the sale, the Board, through Cravath, confirmed with Berry a final time that he was "willing to discuss an equity rollover with any potentially interested party that the Board selected as a winning bidder." *Id.* ¶ 114.

[213] *See id.* ¶¶ 79, 104.

public.[214] As a result, by the time the Board decided to sell, Fresh Market was already in the midst of conducting a public strategic review.[215] As the Plaintiff notes, this put the Director Defendants' in straightened circumstances.

As noted above, *Revlon* can provide a contextual inquiry about whether the Director Defendants' choices were "reasonable under the circumstances as a good faith attempt to secure the highest value reasonably attainable,"[216] but the Plaintiff is still obligated to plead a non-exculpable claim. In this context, such a pleading requires the Plaintiff to show that it is reasonably conceivable that the Director Defendants *knowingly chose* to ignore their duty once a sale process was commenced; to maximize stockholder value.[217]

The Plaintiff suggests that two alternatives existed to the Director Defendants' choice: they could have said "no" to Apollo and sued Berry, or they could have leveraged exclusivity with Apollo for a higher price range.[218] But Delaware law is clear that there is no blueprint to fulfill fiduciary duties in the company-sale

---

[214] *Id.* ¶ 94.

[215] *See id.* ¶ 98.

[216] *See RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 849 (Del. 2015) (quoting *C & J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Trust*, 107 A.3d 1049, 1066 (Del. 2014)).

[217] *Chester Cty. Employees' Ret. Fund v. KCG Holdings, Inc.*, 2019 WL 2564093, at *17 (Del. Ch. June 21, 2019).

[218] Pl. Sell-Side Br., at 17.

41

situation.[219]  More to the point, the Plaintiff must plead facts from which I may reasonably infer that the Director Defendants were aware of these alternatives, understood that they would maximize value, *but nonetheless chose instead to act against the interests of the Company and its stockholders*.  To the extent the Plaintiff contends that good faith in this context *required* a standstill of any sales process, I reject that conclusion.  As to the suggestion that the Director Defendants could have traded exclusivity with Apollo for a higher price range, it is true that this was an option.  Instead, they chose to institute an auction and solicit multiple bids.  Doing so, the Plaintiff argues, meant they "indulged . . . fictions" about Berry's openness to equity partners other than Apollo, and about their ability to solicit bids.[220]  It is conceivable that this was unwise.  But the alleged facts do not reasonably support the conclusion that the Director Defendants "knowingly and completely failed to undertake their responsibilities" by instituting an auction and soliciting bids from a wide field of suitors, rather than opting for a different potential value-enhancing

---

[219] *See Wayne Cty. Employees' Ret. Sys. v. Corti*, 2009 WL 2219260, at *11 (Del. Ch. July 24, 2009), *aff'd*, 996 A.2d 795 (Del. 2010) ("Again, there is no 'blueprint' that directors must follow to satisfy their fiduciary obligations in a change of control transaction. Rather, what a director must do to discharge her fiduciary obligations depends on the circumstances in which the director is acting."); *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *7 (Del. Ch. Jan. 3, 2013) ("There is no single path that a board must follow in order to maximize stockholder value, but directors must follow a path of reasonableness which leads toward that end." (quoting *In re Smurfit–Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *10 (Del. Ch. May 20, 2011), *rev'd* May 24, 2011 (footnote omitted))).

[220] Pl. Sell-Side Br., at 17.

choice.[221] In a difficult situation, where the sale of the Company was likely, and the likely winner was Apollo, the Director Defendants made a decision to maximize value through an auction process. During the process, Apollo increased its offer. I cannot reasonably infer, based on the alleged facts, that the Director Defendants' decision to run an auction was in bad faith.

### b. Structure and Oversight of the Sales Process

The Plaintiff also alleges the Director Defendants exhibited bad faith in their structuring and oversight of the sales process. As with a decision to sell, constructing a process requires reasonable good faith effort, and "[t]here is no single path that a board must follow. . ."[222] According to the Plaintiff, the best evidence of a bad faith process was the choice to refuse potential bidders an opportunity to communicate with the Berrys.[223] The Director Defendants extracted a promise from Berry not to discuss an equity rollover with *any* party, until authorized by the Board.[224] Even when at least one party expressed interest in communicating with Berry, the Board refused to lift the no-communication policy until it selected a winning proposal and

---

[221] *See Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243–44 (Del. 2009) ("[I]f the directors failed to do all that they should have under the circumstances, they breached their duty of care. Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty.").

[222] *Novell*, 2013 WL 322560, at *7 (quoting *Smurfit–Stone*, 2011 WL 2028076, at *10 (footnote omitted)).

[223] Pl. Sell-Side Br., 46–47.

[224] SAC, ¶ 114.

established material terms.[225] This is evidence, the Plaintiff argues, that the Director Defendants "did not trust Ray Berry not to discourage competing bids."[226]

Even accepting the Plaintiff's conclusion here as true, the Director Defendants' decision appears rational, rather than in bad faith. The point of the auction process was to encourage, not discourage, competing bids. The Director Defendants knew Berry held, at this point, a strong preference for Apollo. Thus, they could guess that communications with Berry might discourage competing bids, as the Plaintiff suggests. Logically, preventing Berry from discouraging these bids would keep the field as neutral as possible and drive the price up, not down. A reasonable conclusion from this is that the no-communications policy was a reasonable decision for structuring the auction process if the Director Defendants sought to neutralize Apollo's advantage and stimulate competition. In any event, the facts pled, if true, do not imply bad faith.

The Plaintiff suggests that best practice would have been to permit Berry to communicate with potential bidders. Perhaps so. Another view, expressed by the Director Defendants, is that such a course would effectively have handed the reigns of the auction process to Berry, when the Board's goal was to separate him from the

---

[225] *Id.* ¶¶ 126–27.

[226] Pl. Sell-Side Br., 47.

process to avoid his influence.[227] If Berry were allowed open communication with bidders and expressed or implied his preference to work only with Apollo, the effect could have been a swift elimination of anyone but Apollo from the bidding field. The Plaintiff's inference—that the Director Defendants sequestered Berry for the purpose of hiding their sham process from the light of due diligence—is not reasonable in light of the Board's recognition that Berry had a favorite in the auction process and the need to neutralize that influence. In other words, faced with competing scenarios, either of which could have negative consequences to the sale price, the Board, as it was required to do, chose one. Nothing in this implies bad faith.

I also do not find bad faith regarding the Director Defendants' oversight of J.P. Morgan. The Plaintiff contends the Directors Defendants ought to have seen past an "artfully drafted conflict disclosure memorandum" because it "should have raised suspicion."[228] J.P. Morgan's conflicts memorandum stated that the "senior deal team members" working for Fresh Market were not "currently providing services" for "member[s] of the coverage team" for Apollo.[229] According to the

---

[227] The Plaintiff cites to case law exploring the notion that a buyer's ability to see an insider's body language is important information, and that best practice is chaperoned, insider cooperation with interested bidders. These cases do not involve the particular situation Fresh Market's Board faced; needing to stimulate competition by screening a non-neutral insider who might otherwise stymie it. In any event, failure to apply best practices does not imply bad faith.

[228] Pl. Sell-Side Br., at 55.

[229] SAC, ¶ 149.

45

Plaintiff, the Director Defendants ought to have possessed the acumen to probe further and ask if any of J.P. Morgan's Apollo coverage team were working behind the scenes to provide services to Apollo in connection with Fresh Market. Failure to look past the conflicts disclosure memorandum may have been careless, but the pleading standard here is the reasonable implication of scienter, not negligence or even gross negligence. I do not find that relying on J.P. Morgan's memorandum is an *intentional* dereliction of duty.[230] Similarly, to the extent the Plaintiff alleges the Director Defendants acted in bad faith by hiring advisors on a contingent fee structure, I find nothing in these circumstances sufficient to overcome the general rubric of Delaware law that such arrangements are routine and do not imply bad faith.[231]

The Plaintiff also contends that the facts surrounding the creation of financial scenarios at the auction's tail end, which enabled a fairness opinion, demonstrates the Director Defendants' bad faith. The financial scenarios suggest to the Plaintiff

---

[230] I note that the standard for aiding and abetting a breach of fiduciary duty involves a different standard, and nothing herein necessarily absolves J.P. Morgan of liability. For reasons noted below, I reserve decision on the non-fiduciary causes of action.

[231] *See In re Alloy, Inc. S'holder Litig.*, 2011 WL 4863716, at *11 (Del. Ch. Oct. 13, 2011) ("[W]hile stockholders may have sufficient concerns about contingent fee arrangements to warrant disclosure of such arrangements, that need to disclose does not imply that contingent fees necessarily produce specious fairness opinions."). Delaware case law generally recognizes the efficiency and mundanity of the contingent fee structure. *See In re Atheros Commc'ns., Inc. S'holder Litig.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) ("Contingent fees are undoubtedly routine. . ."). The Plaintiff cites several cases for the proposition that a contingent fee may misalign the *advisor's* interests, but these cases are applicable to the aiding and abetting claims, not to the fiduciary claims at issue in this Opinion.

a "conspiracy to deflate the numbers" executed by Duggan and Cravath in coordination with Director Defendants Naylor and Shearer that kept lead director Noll in the dark while allowing J.P. Morgan to present the Board with downward sensitivity analyses.[232] The SAC, however, does not allege that the Director Defendants, including the Committee, had more than limited involvement with the financial scenarios.

According to the SAC, the Committee met three times in the weeks leading up to Apollo's bid. Duggan organized a meeting on February 25, 2016, at which the Committee determined it would "request that the Corporation's management develop additional financial projection scenarios to reflect updated assumptions. . ."[233] At the next meeting on March 3, the Committee "reiterated its prior request that management and JP Morgan" refine sensitivities "so that the Board would have that perspective when it met to determine how to respond to any bids that were received."[234] Finally, the Committee met a third time on March 8—the day of Apollo's bid.[235] The minutes for that meeting state, "Management confirmed that it

---

[232] *See* Pl. Sell-Side Br., at 59–60.

[233] SAC, ¶ 162.

[234] *Id.* ¶ 168.

[235] *Id.* ¶ 178.

was preparing more fulsome[236] forecast sensitivities for J.P. Morgan to use in its valuation analyses."[237]

The Plaintiff identifies three things in connection with this series of meetings over the financial scenarios from which she infers bad faith. First, the Plaintiff points out that Noll did not attend the first two of these three meetings. Correspondence referenced by the SAC, however, shows that Noll was in London on business for the Company and that he was included on the emails setting up the meetings.[238] Nothing about the timing—necessitated by the sales process itself—implies bad faith on the part of the Committee members. Second, the Plaintiff notes that Duggan's post-meeting outline sent to Naylor and Shearer differed from the one sent to Noll.[239] The referenced correspondence shows that Duggan sent the material regarding financial scenarios to Naylor and Shearer for review, after which he would provide it to Noll.[240] Again, nothing about this sequence implicates a Committee member's bad faith. Third, the Plaintiff points out that the board minutes for the March 8 meeting falsely report that *management* developed sensitivities for J.P. Morgan, when in fact

---

[236] *See Jeter v. RevolutionWear, Inc.*, 2016 WL 3947951, at *9 n.90 (Del. Ch. July 19, 2016).

[237] SAC, ¶ 178.

[238] Iqbal Aff., Ex. C, at 1 (Noll stated in email sent the day of meeting, "I'm in London meeting with investors.").

[239] SAC, ¶ 165.

[240] *See* Iqbal Aff., Ex. F, at 1 ("Working with outside counsel, we put together an outline of a Board meeting at which a proposal is considered and that outline is attached . . . Once you take a look, I would plan on sharing with the Committee as a whole.").

J.P. Morgan developed the sensitivities.[241] The Plaintiff argues the Committee falsified its minutes to keep from divulging the "cascading downside sensitivity scenarios" provided by J.P. Morgan.[242] The Plaintiff, however, does not allege that the Committee knew of the number or precise timing of revised sensitivities given to management. Nor does the Plaintiff plead facts from which I can make an inference that the Committee concealed that management was untruthful when it informed the Board it was creating forecast sensitivities.

As pled, the facts do not lead to a reasonable inference that directors Naylor and Shearer did more than request financial scenarios and review those scenarios when they were provided through management. Nothing in the pleadings leads to an inference that the Director Defendants acted with scienter with respect to the financial projections.

### c. Disclosure in the 14D-9

Finally, the Plaintiff contends the failure to disclose material facts in the 14D-9 demonstrates bad faith. The Plaintiff points out that our Supreme Court, in review of my initial decision on the motion to dismiss, concluded that the stockholder vote in favor of the merger had no cleansing effect because the proxy contained material omissions. The inquiry here, however, under Rule 12(b)(6), requires a pleading of

---

[241] SAC, ¶ 178.

[242] Pl. Sell-Side Br., at 30, 59.

facts with respect to the omissions from which I may reasonably infer breach of the

duty of loyalty, and not simply adequate pleading of a material omission.[243] I have

already found above that the SAC does not state a claim of director interestedness,

and so allegations regarding disclosure must plead bad faith. Bad faith, in the

context of omissions, requires that the omission be intentional and constitute more

than an error of judgment or gross negligence.[244] The Plaintiff's argument relies on

the presumption of misconduct in operating a bad-faith sham auction; in this view,

the omissions are explained as a subsequent concealment of that misconduct.[245] But,

as stated above, I do not think the alleged facts create a reasonable inference that the

Director Defendants acted on improper motives; therefore the "cover-up" theory

---

[243] *Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016) ("[W]hen asserting a disclosure claim for damages against directors *post-close*, a plaintiff must allege facts making it reasonably conceivable that there has been a *non-exculpated breach* of fiduciary duty by the board in failing to make a material disclosure." (citing *Chen v. Howard*, 87 A.3d 648, 691 (Del. Ch. 2014))).

[244] *See Kahn v. Stern*, 2017 WL 3701611, at *14 (Del. Ch. Aug. 28, 2017), *aff'd*, 183 A.3d 715 (Del. 2018) ("to state a non-exculpated claim the Plaintiff cannot simply point to erroneous judgment in the failure to make a disclosure, implicating the duty of care, but rather must point to facts in the Complaint supporting an inference that the Board acted in bad faith in issuing the disclosure, implicating the duty of loyalty."); *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *8 (Del. Ch. Oct. 16, 2013) ("[A]ny disclosure claim that does not adequately allege a violation of the duty of good faith cannot survive the exculpation provision in [the] certificate of incorporation."); *In re Alloy, Inc.*, 2011 WL 4863716, at *14 (Del. Ch. Oct. 13, 2011) ("An exculpatory provision under 8 Del. C. § 102(b)(7) . . . would preclude . . . a claim for money damages for disclosure violations that were made in good faith—i.e., for failures to disclose resulting from a breach of the fiduciary duty of care rather than from breaches of loyalty or good faith.").

[245] *See* Pl. Sell-Side Br., at 63–64 ("The defendants who devised or knowingly authorized a sham sale process or knowingly conspired to present artificially downward-adjusted numbers to the Board cannot prevail at the motion to dismiss [stage] by claiming ignorance or mere gross negligence about how the 14D-9 conceals that misconduct.").

50

fails. The Plaintiff, to withstand the Director Defendants' Motion to Dismiss based on disclosures, must adequately allege bad faith in the disclosures themselves.

The Supreme Court found that the 14D-9 omitted material facts that a stockholder likely would have considered important.[246] The 14D-9 differs from the facts alleged by the Plaintiff in several significant ways. First, the 14D-9 does not disclose facts from which stockholders would understand that Berry lied to the Board about his first contact with Apollo; the 14D-9 states only that Berry made an agreement with Apollo after it withdrew its first offer, and not on September 25, as the SAC alleges.[247] It omits Berry's multiple statements regarding his strong preference for Apollo. It also omits the activist pressure the Board faced from Neuberger and Berry at the time it decided to sell the Company. These omissions do not give the stockholders a full and accurate portrait of the decision to sell and Apollo's advantages in the sale process.

But, given the facts the 14D-9 does disclose, it is not reasonable to infer that the 14D-9 represents the knowingly-crafted deceit or knowing indifference to duty

---

[246] *Morrison v. Berry*, 191 A.3d 268, 283 (Del. 2018), *as rev'd* (July 27, 2018) ("Plaintiff has unearthed and pled in her complaint specific, material, undisclosed facts that a reasonable stockholder is substantially likely to have considered important in deciding how to vote.").

[247] *See* 14D-9, at 17–18 ("Mr. Berry reiterated that he had not committed to any transaction with [Apollo] (or any other potential bidder)"), 20 ("since [Apollo's] earlier offer had expired on October 20, 2015, Mr. Berry had engaged in one conversation with [Apollo], and during that conversation he had agreed that he would roll his equity interest over into the surviving entity if [Apollo] were to be successful in agreeing to a transaction with [Fresh Market].").

51

that would show bad faith. The 14D-9 does disclose Berry's statement that he had discussed a transaction with Apollo early on,[248] Apollo's representation of its partnership with Berry,[249] the news articles describing a Berry-Apollo relationship,[250] and Berry's November admission of an agreement to roll over equity in case of a successful Apollo bid.[251] The extent of shareholder pressure at the time of the decision to sell is missing, but the fact that activism was a Board concern is disclosed.[252] Additionally, some facts regarding the financial scenarios—the 15% risk adjustment to the Management Projections, the timing of the final submissions by J.P. Morgan, and statements regarding management preparation—were not included, but the 14D-9 discloses in extensive detail the projections, the reasons behind them, and the Board's reasons for requesting them.[253]

---

[248] 14D-9, at 17 (prior to initial bid, Apollo "asked Mr. Berry if he would be interested in participating in a transaction through an equity rollover.").

[249] *Id.* ("[Apollo's] letter also included a reference that [Apollo] and Messrs. Ray and Brett Berry would be working in an exclusive partnership in connection with a potential acquisition of [Fresh Market].")

[250] *Id.* ("On October 16, 2015 . . . a news outlet published an article speculating that Ray Berry was exploring a bid to take [Fresh Market] private with the help of a private equity firm and that [Apollo] had agreed to work with Mr. Berry on a potential offer for [Fresh Market].").

[251] *Id.* at 20 ("[Berry] had agreed that he would roll his equity interest over into the surviving entity if [Apollo] were to be successful in agreeing to a transaction with [Fresh Market].").

[252] *Id.* at 18 ("Also at the October 15, 2015 Board meeting, to enhance efficiency in light of the fact that [Fresh Market] could become the subject of shareholder pressure and communication and potentially additional unsolicited acquisition proposals in light of [Fresh Market's] recent stock performance, the Board decided to create a committee. . .").

[253] *See id.*, at 32, 40–50.

Consistent with the Supreme Court's decision, the omission of the material facts described above creates an inference that the crafters of the 14D-9 at least negligently failed to portray the full extent of Apollo's advantage in the sale through its early agreement with Berry, Berry's lie to the Board and his preference for Apollo, and the stockholder pressure that encouraged the sale in the first place. But given what the 14D-9 discloses, I do not think it is reasonable to infer that the omissions, though material, demonstrate an intentional derogation of duty or an intent to create a misleading document. If the Director Defendants' intent was to ensure that the 14D-9 would entice stockholders to vote for the merger in the mistaken belief that the directors were unaware of activist pressure, or to hide that Berry's weight was behind the Apollo bid, they did a poor job, indeed. So poor, I find, that a reasonable inference of bad faith in the omissions cannot be drawn.

*B. The Plaintiff States a Claim for Breach of the Duty of Loyalty against Berry*

As with the Director Defendants, the Plaintiff must plead a non-exculpated claim against Berry, which requires sufficiently alleging he was either self-interested or acted in bad faith.[254] I deny the Berrys' Motion to Dismiss as it relates to Ray

---

[254] *Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016) ("when asserting a . . . claim for damages against directors post-close, a plaintiff must allege facts making it reasonably conceivable that there has been a non-exculpated breach of fiduciary duty. . ." (citing *Chen v. Howard*, 87 A.3d 648, 691 (Del. Ch. 2014))).

Berry because the SAC adequately alleges that Berry acted in self-interest and in bad faith in a manner that conceivably harmed Fresh Market.

As Berry notes, he absented himself from the Fresh Market transaction. After informing the board on October 15 that he was unaware of any other private equity buyers with whom he would be comfortable doing an equity rollover, Berry recused himself from the meeting.[255] After this recusal, Berry ceased to attend board meetings or otherwise participate in the transaction on behalf of the Company.[256] Although he expressed disgruntlement to Anicetti that the Company did not fast-track Apollo, the alleged facts do not give rise to the inference that he attempted to influence or participate as a director on the Fresh Market side of the deal after October 15. Under Delaware law, deliberate and effective removal from the decision-making process can shield a director from liability from claims that he was an interested party.[257]

The SAC, however, also pleads facts that, accepted as true for the purpose of deciding this motion, show that Berry engaged in a pattern of misdirection and lack

---

[255] SAC, ¶ 88–89.

[256] Berry also waived his right to notice of further meetings. 14D-9, at 18–19.

[257] *See In re Tri-Star Pictures, Inc. Litig.*, 1995 WL 106520 (Del. Ch. Mar. 9, 1995) ("Delaware law clearly prescribes that a director who plays no role in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that the board's decision to approve that transaction was wrongful."); *see also Citron v. E.I. du Pont de Nemours & Co.*, 584 A.2d 490 (Del. Ch. 1990) ("because the [directors] played no role in the Merger Committee's, or the Board's, decisionmaking process . . . plaintiff has failed to establish a factual or legal basis for a claim against [them].").

of candor with the Board for nearly five months prior to the sale process. From this, I can reasonably infer he was not motivated by the best interests of the Company, and that he intentionally ignored his duties as a director. According to the alleged facts, Berry first spoke to Apollo concerning a transaction on July 3, 2015.[258] Company procedure obliged him to disclose Apollo's interest to the Board.[259] His fiduciary duty required the same.[260] It is not reasonably arguable that Berry did not understand this obligation: his fellow directors brought private equity overtures to the Board, and Berry himself shared an indication of interest from Oak Hill Capital Management in September.[261] But rather than disclose Apollo's interest to the Board, he kept the communications private for July, August, and September, and during that time he formulated a proposed transaction with Apollo.[262] He did this knowing the Board was attempting to navigate offers in the midst of a company turnaround.[263]

Berry went as far as forming an oral agreement to roll over his equity in case of a successful bid before he contacted Duggan regarding how Apollo should present

[258] SAC, ¶¶ 55–58.

[259] *See id.* ¶¶ 61–62.

[260] *See HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999) ("[D]irectors have an 'unremitting obligation' to deal candidly with their fellow directors" regarding interested transactions).

[261] SAC, ¶¶ 70, 74.

[262] *Id.* ¶¶ 62, 67, 75.

[263] *Id.* ¶¶ 70, 74.

the proposal.[264] This created a situation in which Duggan and Noll addressed Neuberger's desire for a sale of the Company within a few days of Duggan discovering that Berry, the Company's Chairman, was cooperating with a private equity firm to propose a buyout.[265]

To compound the situation, Berry intentionally obscured the extent of his involvement with Apollo: he downplayed discussions with Apollo to Duggan, portraying his stance as a willingness to sell or roll over his equity contingent upon Board approval.[266] However, the communication between Apollo and the Company imply, and for the pleading stage I infer, that Berry was working exclusively with Apollo to take Fresh Market private. Thereafter, Berry lied, claiming to Duggan he had no commitment to or agreement with Apollo.[267] When Duggan reported this to the Board, Berry confirmed his purported lack of commitment or agreement.[268] Further compounding the situation, Berry failed to correct the misleading statements while the Board dealt with Apollo's initial offer, digested leaked publicity, publicly

---

[264] *Id.* ¶¶ 76–77.

[265] *Id.* ¶¶ 77–79.

[266] *Id.* ¶ 84.

[267] *Compare id.* ¶ 86 (Berry represented he "had no arrangement or agreement with Apollo") *with id.* ¶ 104 ("[Berry] agreed, as he did in October, that, in the event Apollo agreed on a transaction with [Fresh Market], he would roll his equity interest over into the surviving entity . . . Mr. Berry's agreement with Apollo is oral.").

[268] *Id.* ¶ 87.

announced a strategic review, and received a renewed offer from Apollo.[269]  Only when prompted did Berry concede his prior agreement with Apollo.[270]  Knowing the Company was in a strategic review and had an offer on the table, Berry accompanied his disclosure with a notification that he would "give serious consideration to selling his stock" into the market absent a going-private transaction.[271]

Accepting this alleged narrative as true, I find it reasonably conceivable that Berry acted for reasons other than the Company's best interest.  Berry argues that a more logical tactic, if he wanted to pressure the Company to sell to Apollo, would be to overstate—rather than obfuscate—his commitment to Apollo.  This is unpersuasive; a director owes candor to his fellows, a duty Berry consciously avoided.  While Berry's motives for taking this approach may be obscure, I cannot reasonably infer that his repeated misdirection and his lie to the Board were motivated by the Company's best interests.  And while the Plaintiff makes allegations regarding Berry's motives, and why his breaches were helpful to him and harmful to the Company, I need not resolve that matter at this pleading stage.  While a stockholder may exercise her rights with respect to her stock as she sees fit, when she is acting as a fiduciary it must be in the corporate interest.  Because of that, I

---

[269] *See id.* ¶¶ 89–104.

[270] *Id.* ¶ 104.

[271] *Id.*

draw the inference in Plaintiff's favor and find it reasonable to conclude that Berry acted—*qua* director—with his own interests as a potential buyer foremost.

Again, the Plaintiff's allegations support a reasonable inference of bad faith because as alleged, the facts suggest Berry intentionally disregarded his fiduciary duties and instead pursued self-interest. Aware of manifest interest in the company and the pressure on the Board, Berry allowed the Board to make decisions with incomplete knowledge of his commitment to Apollo. Even after he recused himself, he left the Board in the dark about his agreement, and he shared the full story only when prompted on the threshold of a decision to initiate the sale process.[272]

In other words, the "difficult situation" the Board faced in December 2015 was due, in part, to Berry. While Berry contends he fulfilled his fiduciary duties in full by adequately disclosing his interests before the Board initiated a sales process, I can reasonably conceive based on the alleged facts that nearly five months of serious misinformation regarding the Chairman's relationship with the strongest prospective buyer created a harm.[273] As alleged, Berry's silence, falsehoods, and misinformation conceivably violated the basic principle that "fiduciaries . . . may not use superior information or knowledge to mislead others in the performance of their

---

[272] *Id.* ¶¶ 104, 110.

[273] Berry argues stringently that damages cannot result from his actions, given the disclosures he made to the Board in the November Email. Damages, however, are not an element of a breach of fiduciary duty cause of action, and consideration of damages awaits a developed record.

own fiduciary obligations."[274]   The Berrys' Motion to Dismiss, as it regards Ray

Berry, therefore, is denied.

### C. The Plaintiff States a Claim for Breach of Fiduciary Duty against Duggan

Duggan was Fresh Market's General Counsel.[275]   As an officer of Fresh

Market, Duggan is not exculpated by the Company's 102(b)(7) provision.   The

Plaintiff may plead either a breach of the duty of care or loyalty to overcome

Duggan's Motion to Dismiss.   Standards for breaches of the duty of loyalty have

been described above.   A breach of the duty of care exists if Duggan acted with gross

negligence.[276]   Gross negligence involves more than simple carelessness.   To plead

gross negligence, a plaintiff must allege "conduct that constitutes reckless

indifference or actions that are without the bounds of reason."[277]   The Plaintiff must

plead sufficient facts to make it reasonable to conclude that Duggan has failed this

standard.   The Plaintiff's allegations here center on three areas: Duggan's

communications with Berry in the fall of 2015, his involvement in the preparation

of additional financial projections by J.P. Morgan, and his role in the preparation of

---

[274] *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989); *see also Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939) ("Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.").

[275] SAC, ¶ 4.

[276] *See Zucker v. Hassell*, 2016 WL 7011351, at *7–8 (Del. Ch. Nov. 30, 2016), *aff'd*, 165 A.3d 288 (Del. 2017) (defining a breach of the duty of care as "having committed gross negligence.").

[277] *Zucker*, 2016 WL 7011351, at *7 (quoting *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *26 n.254 (Del. Ch. May 8, 2015)).

the 14D-9. For the reasons explained below, I find that while the allegations against Duggan do not successfully plead a claim for a breach of the duty of loyalty, they adequately allege gross negligence with regard to the disclosures in the 14D-9, and on that ground I deny Duggan's Motion to Dismiss.

First, the Plaintiff alleges Duggan's interests in the transaction improperly motivated him to help complete a sham sale.[278] A change-in-control would bring Duggan $1.2 million in single-trigger equity-based compensation, with an additional $1.1 million in double-trigger compensation if he were terminated following the merger.[279] The change-in-control benefit was not exclusive to a purchase by Apollo, I note, and would not predispose Duggan to encourage a sale to Apollo exclusively, nor a sale at an unfair price. Generally, change-in-control benefits arising out of a pre-existing employment contract do not create a conflict,[280] and nothing in the alleged facts suggests Duggan's single-trigger bonus was unique or specially negotiated in anticipation of the Apollo transaction. The fact that Duggan remained with the Company following the transaction suggests his double-trigger compensation was not a motive.

---

[278] SAC, ¶ 235.

[279] *Id.* ¶ 10.

[280] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *11 (Del. Ch. Jan. 3, 2013) ("[T]he possibility of receiving change-in-control benefits pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law" (citing *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *22 (Del. Ch. May 20, 2011), *as rev'd* (May 24, 2011); *Nebenzahl v. Miller*, 1993 WL 488284, at *3 (Del. Ch. Nov. 8, 1993))).

The Plaintiff's remaining allegation—that Duggan helped engineer a sham transaction "to ingratiate himself with Ray Berry and Apollo" so he could remain with the company and fulfill a "person goal[]" of moving into a business role—is largely conclusory.[281] It is also belied by the fact, as the Plaintiff herself notes, that a double-trigger bonus was available to Duggan upon termination. The fact that sometime after the merger, Duggan received a business role "in addition to General Counsel" does not sufficiently support an inference of a *quid pro quo* with the buyers for improper support of Apollo.[282] The Plaintiff also points to the fact that Berry emailed Duggan following the merger and thanked him for his "smart and caring work" and suggested a glass of wine.[283] This, to my mind, is not the smoking gun that the Plaintiff posits. It is too weak a reed to support a reasonable basis from which to infer Duggan was working for Berry against the interests of the Company. In sum, I cannot infer from the alleged facts that improper motives guided Duggan through the sale process. I note that all the inferences the Plaintiff asks me to draw above are in support of breach of the duty of loyalty; nothing in that part of the pleading supports an inference of gross negligence.

---

[281] SAC, ¶ 10.

[282] *Id.*

[283] *Id.* ¶ 194.

The Plaintiff also alleges Duggan's inquiries with Berry in September and October 2015—which the Plaintiff characterizes as insufficiently rigorous—breached his fiduciary duty. As a general rule, an officer does not have a duty to probe into wrongdoing unless he has reasonable suspicion that such activity is afoot.[284] According to the alleged facts, Duggan first received news of Apollo's interest from Berry on September 25, and then from Jhawar at Apollo on September 28.[285] Thus, he knew that Berry and Apollo had communicated and that Apollo's bid was forthcoming.[286] When that bid arrived, it stated as fact that Berry and Apollo were in an exclusive relationship.[287] At that point, Duggan went to Berry and asked him about this purported relationship, and Berry denied it.[288] Duggan reported Berry's version to the Board, which declined further inquiries.[289] When Berry made

---

[284] *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 969 (Del. Ch. 1996) ("[A]bsent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf.").

[285] SAC, ¶¶ 77–78.

[286] Plaintiff reads Duggan's failure to communicate these communications immediately to the Board as evidence of Duggan's complicity with Berry, but the SAC does not allege Duggan withheld any facts or otherwise failed to inform the Board as it reacted to Apollo's bid over the following weeks.

[287] SAC, ¶ 80.

[288] *Id.* ¶¶ 83–84.

[289] *Id.* ¶ 87.

his contrary disclosure in the November Email, Duggan reported it in full to the Board.[290]

As alleged, these facts show that when prompted by Apollo's offer, Duggan investigated by asking Berry about his relationship with Apollo. The Plaintiff offers a list of follow-up questions and forensics she contends Berry's answer should have prompted.[291] It may have been wise to explore further. Failure to do so may have been poor lawyering. Given the circumstances and inquires Duggan made, however, I do not find the Plaintiff has pleaded facts supporting gross negligence. Prompted by Apollo's offer, Duggan investigated, received Berry's account, reported it to the Board, and Berry confirmed it.[292]

Plaintiff next alleges Duggan breached his fiduciary duties by organizing a scheme to obtain downward revised projections from J.P. Morgan without allowing Noll's input. Duggan's motive, according to the Plaintiff, was to create a lower price range that would justify the Board's decision to sell, thus completing the sham process.[293] In the Plaintiff's scenario, Duggan's behavior is intentional and implicates a breach of loyalty.

---

[290] *Id.* ¶ 110 ("Duggan read the November 28 Email in its entirety to the Board.").

[291] *See* Pl. Sell-Side Br., at 13.

[292] SAC, ¶¶ 83, 87.

[293] *Id.* ¶ 158 ("Duggan worked to . . . drive the creation of downward sensitivities that could support a Board decision to sell the Company. Duggan executed a Cravath-driven process to facilitate a sale to Apollo in the face of fading bidder interest from anyone else. . .").

I find that the communications on which the Plaintiff relies in the SAC undermine an inference of a scheme to screen Noll. As alleged, Duggan organized a meeting with outside counsel and two members of the Committee—Naylor and Shearer—to discuss "process and legal matters."[294] Later, he elaborated that the meeting was to "walk through the type of information that we should expect the Board will receive in the event an offer is presented. . ."[295] Duggan included Noll on the emails setting up the meeting.[296] The timing of the meeting was dictated by the sales process. Noll, however, was abroad on Company business. At the meeting, the Committee determined to request "additional financial projection scenarios" from management.[297] Afterward, according to the Plaintiff's allegations, Duggan recounted the meeting to Noll but said nothing about the financial scenarios.[298] The communications the Plaintiff incorporates by reference, however, indicate that Duggan intended to share all the materials and plans with Noll after review by the Committee members who had requested the scenarios.[299]

---

[294] *Id.* ¶ 159.

[295] *Id.* ¶ 161.

[296] *See* Iqbal Aff., Ex. C (including Noll in emails arranging Committee meeting).

[297] SAC, ¶ 162.

[298] *Id.* ¶ 163.

[299] *See* Iqbal Aff., Ex. F ("Working with outside counsel, we put together an outline of a Board meeting at which a proposal is considered and that outline is attached . . . Once you take a look, I would plan on sharing with the Committee as a whole.").

I do not find Duggan's process evinces a breach of loyalty or bad faith. Nor do I see sufficient allegations from which to infer gross negligence. Suggesting additional financial scenarios to prepare the Board for bids—particularly when the last projections were three months old—reasonably suggests Duggan was fulfilling his duties on behalf of the Company, not acting outside the bounds of reason. The scheme to keep Noll in the dark is not supported by the facts as alleged. As noted, the emails incorporated into the complaint by reference suggest Duggan in fact shared with Noll the plans to request additional financial scenarios. In support of her argument, the Plaintiff points to the fact that six months before, Noll had said that offers based on "current valuation" were "non-starters" and suggested a value range of approximately $45-$70 per share.[300] Noll's view of the Company's value six months before cannot reasonably support an inference that Duggan schemed to keep the financial projections from Noll, particularly when Duggan indicated he intended to share those very projections with Noll.

Finally, the Plaintiff alleges Duggan's role in the 14D-9 demonstrates a breach of his fiduciary duties. The SAC notes that Duggan was "responsible for drafting the 14D-9" and that he "certified the accuracy" of the disclosure.[301] I have already described the omissions present in the 14D-9 earlier and will not repeat them in full

---

[300] *Id.* ¶ 70.

[301] *Id.* ¶¶ 22, 199.

here. Importantly, our Supreme Court found four omissions, at least, to be material: The 14D-9 omits (1) that Berry lied to the Board about his agreement with Apollo, (2) his statements suggesting a clear preference for Apollo and unwillingness to consider an equity rollover with other parties, (3) his indication that he might sell his shares if the Company did not embark on a sale, and (4) the "depth and breadth" of current shareholder pressure.[302] As I also discussed, the 14D-9 does disclose that Berry made an agreement with Apollo, that news of his agreement leaked to the press, that Apollo represented its relationship with the Berrys as exclusive, and that the Board was concerned about the prospect of activist pressure. The omissions, while material, do not support an inference of bad faith. The Plaintiff argues that the omissions suggest that Duggan intended to disguise his disloyal actions, but as just recounted, on examination of Duggan's involvement in the sale process, I have already found that it does not adequately plead disloyalty on Duggan's part.

I turn, then, to the allegations of gross negligence. "Because fiduciaries . . . must take risks and make difficult decisions about what is material to disclose, they are exposed to liability for breach of fiduciary duty only if their breach of the duty

---

[302] *See Morrison v. Berry*, 191 A.3d 268, 284–288 (Del. 2018), as revised (July 27, 2018). I note that the Plaintiff makes allegations of other deficiencies in addition to those addressed by the Supreme Court. Those allegations are detailed in the background section of this Opinion, but I do not need to consider them for the purposes of this decision.

of care is extreme."[303]  Drawing all reasonable inferences for the Plaintiff, I find the allegations conceivably support such a claim here.  Our Supreme Court held that as offered, the 14D-9 "presents a distorted narrative."[304]  For reasons already explained, I do not find that the omissions support an inference of a subsequent concealment of misconduct or a bad faith intent to harm the Company.  Given the omissions, however, the 14D-9 offers stockholders a version of events that, as our Supreme Court found, left them lacking information material to a decision.  Such a distortion of events creates a reasonable inference for the Plaintiff at this stage that Duggan conceivably acted with gross negligence in his role as Fresh Market's General Counsel with regard to the 14D-9.

Given Duggan's role as General Counsel, and given the sales process as pled, I can infer that the omitted facts were omitted with his knowledge.  It is reasonably conceivable that crafting such a narrative to stockholders, while possessed of the information evincing its inadequacy, represents gross negligence on Duggan's part.  Stated simply: 1) the 14D-9 disclosures were materially inadequate; 2) Duggan drafted those disclosures; 3) I can infer that Duggan possessed sufficient facts to know they were materially inadequate; 4) I can infer, then, that Duggan knew he was

---

[303] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 157 (Del. Ch. 2004).  As the Court in *Metro* explains, "a fiduciary in the corporate context cannot be held liable for damages for a failure to disclose a material fact unless that fiduciary acted with at least gross negligence."  *Id.* at 157.

[304] *Morrison*, 191 A.3d at 285.

creating a misleading proxy, and was at least indifferent to his contrary duty to stockholders; and thus 5) the inadequate proxy was the result of Duggan's gross negligence. Of course, another reasonable interpretation is that the 14D-9 represents a good faith but failed effort to make reasonable disclosures,[305] but given the pleading stage, I must choose the inference favoring the Plaintiff. Therefore, his Motion to Dismiss is denied.[306]

### D. The Plaintiff States a Claim for a Breach of Fiduciary Duty against Anicetti

The Plaintiff asserts claims against Anicetti for his roles both as an officer and director. Thus, Anicetti is entitled to protection under 102(b)(7) only for actions he took in his capacity as director.[307] Accepting all well-pled facts as true, I do not find the SAC adequately alleges that Anicetti breached his duty of loyalty as a director, but I do find it adequately alleges a breach of the duty of care in his capacity as CEO of Fresh Market.

---

[305] As Duggan points out, I initially and erroneously determined that the omissions in the 14D-9 were not material. *Morrison v. Berry*, 2017 WL 4317252 (Del. Ch. Sept. 28, 2017), *rev'd*, 191 A.3d 268 (Del. 2018), *as rev'd* (July 27, 2018).

[306] At this stage, the Plaintiff is not required to show that damages resulted from Duggan's actions.

[307] 1 *R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corporations and Business Organizations* § 4.13 (3d ed. 2017) ("[O]ne who is a director and an officer may be exempted from liability for his or her acts qua director. . ."); *Arnold v. Society for Sav. Bancorp*, Inc. 650 A.2d 1270, 1288 (Del. 1994) ("[O]nly those actions taken solely in the defendant's capacity as an officer are outside the purview of Section 102(b)(7).").

First, the Plaintiff contends that Anicetti's employment improperly motivated him to push the merger through for as low a sale price as possible.[308] As noted above, employment agreements not specially negotiated in light of the transaction at issue ordinarily do not make the officer conflicted under Delaware law.[309] Anicetti signed a standard company agreement, in conformance with compensation and severance plans dating back to 2010.[310] His agreement provided for single-trigger bonuses, which could incentivize him regarding a sale, but the Plaintiff does not allege Anicetti specially negotiated or engineered this change-of-control structure. Further, I can infer that this equity-based bonus aligned Anicetti's goals with that of the other stockholders.[311]

The Plaintiff asks me to infer a conflict because Apollo advertised that its interests would be aligned with management's because it based compensation on multiples of invested capital.[312] This suggests that a low buyout price would make

---

[308] SAC, ¶ 184.

[309] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *11 (Del. Ch. Jan. 3, 2013) ("[T]he possibility of receiving change-in-control benefits pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law" (internal citations omitted).

[310] Transmittal Aff. of Jamie L. Brown in Support of the Op. Br. in Support of Def. Richard Anicetti's Mot. to Dismiss Pl.'s Verified Sec. Am. Compl. ("Brown Aff.") Ex. 2 at ¶ 8; *id.* Ex. 3; *id.* Ex. 1, at 5.

[311] *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *12 (Del. Ch. May 22, 2000) (holding that "significant equity interest in the Company" by an executive "aligned him economically with the public shareholders").

[312] SAC, ¶ 184.

hitting high multiples, post-merger, easier.[313]  But I cannot reasonably infer that speculative future performance bonuses would motivate Anicetti to engineer a low price, damaging the present value of his equity vesting.  In sum, I do not find that Anicetti's employment agreement or change-in-control bonuses deprived him of independence.[314]

Next, Plaintiff focuses on the Management Projections and the financial sensitivities created toward the auction's close.  Anicetti designed the Management Projections, and the Plaintiff does not allege that they were other than his best estimates.  The Board was informed of the 15% overall risk adjustment included in those projections.[315]  In February, the Board, through the Committee, requested additional financial projections, and Anicetti's role as officer was properly to respond to the Board's request.[316]

Anicetti's breach, according to the Plaintiff, was in making the revised projections more palatable to the Board by characterizing the Management

---

[313] *Id.*

[314] The SAC does not detail how, even if a low sale price might benefit Anicetti, such benefit would be material to him.  *See id.* ¶ 184 (alleging the multiple of invested capital metric "created a conflict of interest for Anicetti and Ackerman, because a lower buyout price of Fresh Market makes it easier for Apollo to hit [multiple of invest capital] multiples.").

[315] *Id.* ¶ 185.

[316] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 781 (Del. Ch. 2016), *abrogated by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019) ("[O]fficers have a duty to comply with the board's directives.").

70

Projections as "optimistic."[317] At the March 10 meeting, Anicetti described the December Projections as "more of an 'optimistic' case at this point" and "an optimistic scenario if every element of that plan went according to estimates from both an execution and timetable standpoint."[318] In contrast, as the Plaintiff points out, management had recently reaffirmed these same projections: as late as March 1, CFO Ackerman told J.P. Morgan that management still planned to "execute against" the projections.[319] Additionally, the 2016 operating plan management submitted to the Board tracked the Management Projections.[320]

Anicetti's statements regarding the Management Projections are important because they tended to justify the Board's accepting the revised valuation range provided by J.P. Morgan. To my mind, his statements, if false, would implicate his duty of loyalty, not gross negligence. That is, given Anicetti's intimate knowledge of the Management Projections and his oversight of the Company's performance, if the statements were blatantly false, as Plaintiff contends they were, it is not reasonably conceivable that the Company's CEO made them out of carelessness—gross or otherwise—or indifference to duty. I do not find, however, the allegations

---

[317] SAC, ¶ 185.

[318] *Id.*

[319] *Id.* ¶ 166.

[320] *Id.* ¶ 154.

in the SAC support a reasonable inference of a breach of the duty of loyalty regarding these statements.

The fact that management intended to continue to "execute against" its projections does not render false any statement that the projections were also optimistic. Anicetti was brought in to turn the Company around, and to do so quickly; it would not be surprising if the projections he designed were optimistic. The Plaintiff also makes much of the 15% risk adjustment already built into the Management Projections. But both the board minutes and the 14D-9 state that the Board, despite the fact that it would have known of the risk adjustment, nonetheless perceived the Management Projections (even so adjusted) as prone to execution risk.[321] Regarding actual business prospects related to the Management Projections, the Plaintiff alleges that "[p]reliminary results for the first quarter of 2016 showed that comparable store sales were in line with the plan, while new store sales had underperformed slightly relative to the plan."[322] Based on these allegations, I cannot reasonably infer that Anicetti intentionally misled the Board in bad faith or with disloyal motives when making the statements at the March 10 board meeting.

---

[321] *See* Perri Aff., Ex. L, at 18; 14D-9, at 20. As the Plaintiff notes, Anicetti did not remind the Board of the Management Projection's built-in risk adjustment. SAC, ¶ 192. However, Ackerman told the Board at the December 1, 2015 meeting that "in preparing the projections, management had applied a 15% overall risk adjustment, with different initiatives receiving different risk weighting based on likelihood of achievability." *Id.* at 185. Based on this, it is not reasonable to infer that Anicetti actively concealed this aspect of the projections.

[322] SAC, ¶ 185.

Finally, the Plaintiff argues that Anicetti breached his fiduciary duties with regard to the 14D-9. The Plaintiff alleges that Anicetti "participated in the drafting and disseminating" of the 14D-9.[323] Anicetti argues that his work with the 14D-9 was so intertwined with his role as director that he should be given the benefit of the exculpation provision. This may prove true on a more developed record, in which case his actions are exonerated (absent disloyalty). At the pleading stage, however, and in light of the allegation that, in his role as CEO, Anicetti participated in preparing the 14D-9, I infer that Anicetti remains liable in that regard for gross negligence as well as disloyalty in connection with the proxy.

I have already found that the Plaintiff has pled facts that, together with the Plaintiff-friendly inferences at the pleading stage, permit an inference of gross negligence on the part of Duggan in preparing the proxy. While Anicetti, as CEO, may not have been as intimately involved in the drafting as Duggan, given his role as a director, I can infer that he possessed the same knowledge as Duggan of Berry's actions and of the transaction as a whole. Surely, he was aware of the activist pressure on the Board. Therefore, because the Plaintiff alleges that "[i]n his role as CEO," Anicetti participated in "drafting and disseminating" the 14D-9, and because I can infer that, like Duggan, he possessed knowledge of what was being omitted, I

---

[323] *Id.* ¶ 222.

73

find the same analysis that applied to Duggan applies to Anicetti with regard to the 14D-9.

As with Duggan, I can readily infer that Anicetti attempted and failed to create a proper proxy, and breached no duty. Because I can reasonably infer gross negligence as well, at the pleading stage I must do so. As described above, the omissions in the disclosures do not adequately state a claim for a breach of the duty of loyalty. However, the omissions support an inference of gross negligence, and so the Plaintiff states a breach of the duty of care against Anicetti.[324] Therefore, his Motion to Dismiss is denied.

## III. CONCLUSION

For the reasons described above, I grant the Director Defendants' Motion to Dismiss, and deny Duggan's Motion to Dismiss, Anicetti's Motions to Dismiss, and Ray Berry's Motion to Dismiss, in part. The parties should supply an appropriate form of order.

As noted, this Opinion addresses the claims of the parties with fiduciary duties to Fresh Market because these claims are primary. The Plaintiff's aiding and abetting claims against J.P. Morgan, Cravath, and Brett Berry may to some extent be contingent upon my decision in this Opinion. For this reason, I reserve decision

---

[324] As I noted regarding the claim against Duggan, at this stage, the Plaintiff is not required to show that damages would result from Anicetti's actions.

on these motions to dismiss.  The parties should confer and inform me what effect

this Opinion has on proceeding with the remaining motions.